In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-1776

DAVID LEON WOODS,

*Petitioner-Appellant,*

*v.*

DANIEL R. MCBRIDE, Superintendent,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP 99-520-C-M/S—**Larry J. McKinney**, *Chief Judge.*

ARGUED JANUARY 20, 2005—DECIDED NOVEMBER 30, 2005

Before BAUER, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* In the early morning of April 7, 1984, David Woods and two cohorts, Greg Sloan and Pat Sweet, concocted a scheme to steal a television. A few hours later, Woods, Sloan, and Sweet went to the apartment of seventy-seven-year-old Juan Placencia, an acquaintance of Woods's mother. Woods was armed with a knife, although he assured Sloan and Sweet that he intended only to scare Placencia with it. But when Placencia opened his front door, Woods immediately jumped inside and stabbed Placencia repeatedly. Placencia fell back into a chair, pleading for his life. Placencia's pleas did him no good. After Woods took $130 from Placencia's wallet, he continued to stab the elderly man—a total of twenty-one times to the face, neck,

and torso. An autopsy later determined that Placencia died from at least three stab wounds to the heart and a wound to the skull that pierced through to his brain.

Woods and Sloan departed Placencia's apartment with the cash and television in hand. They hid the television in a trash bin and later sold it for $20. They also washed the clothes they were wearing during the robbery and disposed of the knife and other incriminating items in a nearby creek.

Shortly after the discovery of Placencia's body, Woods was arrested and charged with murder and robbery. An Indiana state court jury found Woods guilty of both, and the trial court sentenced Woods to death. Woods's convictions were affirmed on direct appeal in *Woods v. State*, 547 N.E.2d 772 (Ind. 1989) (*Woods I*). A second opinion, issued on rehearing, affirmed Woods's convictions and sentence of death. *See Woods v. State*, 557 N.E.2d 1325 (Ind. 1990), *cert. denied*, 501 U.S. 1259 (1991). Woods filed a petition for post-conviction relief ("PCR"), which the Indiana PCR court denied. The Indiana Supreme Court affirmed the PCR court's denial of relief in *Woods v. State*, 701 N.E.2d 1208 (Ind. 1998) (*Woods II*), *cert. denied*, 528 U.S. 861 (1999). Woods then filed a petition pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus, which the district court denied. *Woods v. Anderson*, 302 F. Supp. 2d 915 (S.D. Ind. 2004).

In this appeal, Woods advances three issues: (1) whether Woods was denied due process because he was not competent at trial;[1] (2) whether Woods's trial counsel failed adequately to gather, marshal, and present mitigating evidence at the penalty phase, thus denying Woods effective assistance of counsel; and (3) whether Woods's due process

---

[1] As discussed below, Woods also brings a related claim that his trial counsel rendered constitutionally ineffective assistance with regard to his competence.

rights were violated when he was granted post-conviction counsel but not the opportunity to air his concerns that he had an "actual conflict of interest" with his appointed PCR counsel.

For the reasons that follow, we affirm.

## I. Discussion

We take Woods's questions in turn, but first we briefly recap the relevant legal standards that guide our review. Woods's habeas petition is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The writ is not easy to come by—section 2254 authorizes issue of the writ only if the challenged decision of the state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2).

"Contrary to" means that a federal court may grant the writ only if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The "unreasonable application" prong in particular is difficult to show—"unreasonable" in this context means "something like lying well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Jackson v. Frank*, 348 F.3d 658, 662 (7th Cir. 2003) ("We have held that under this criterion, habeas relief should not be granted if the state court decision can be said to be one of several equally plausible outcomes."). In the habeas context, an "unreasonable" application is more than simply an "incorrect" application,

so "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, in order to trigger grant of the writ, the state-court decision must be both incorrect and unreasonable. *See Moore v. Casperson*, 345 F.3d 474, 490 (7th Cir. 2003) (citations omitted).

In addition, a state court's factual determinations are presumed to be correct, and a petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *See Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004). In reviewing the district court's denial of the petition, we review the court's findings of fact for clear error and the court's legal conclusions de novo. *See Richardson v. Briley*, 401 F.3d 794, 799 (7th Cir. 2005) (citations omitted).

*A. Competency*

First, Woods's competency claim. Whether a defendant is competent depends on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). It is well established that the due process clause of the Fourteenth Amendment prohibits the states from trying and convicting mentally incompetent defendants. *See Pate v. Robinson*, 383 U.S. 375, 384-85 (1966); *see also Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996) (noting that the Supreme Court has "repeatedly and consistently recognized that 'the criminal trial of an incompetent defendant violates due process'" (quoting *Medina v. California*, 505 U.S. 437, 453 (1992))); *Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996) ("The Constitution forbids trial of one who, for whatever reason, is unfit to assist in his own defense

because our adversarial system of justice depends on vigorous defenses.").

A defendant is entitled to a hearing on his competency if a bona fide doubt arises about his ability to consult with his attorney or his understanding of the charges brought against him. *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *Pate*, 383 U.S. at 385. Likewise, a trial judge must inquire sua sponte into a defendant's mental state if events in court call into question the defendant's competency. *See Timberlake v. Davis*, 409 F.3d 819, 822 (7th Cir. 2005).

As set forth in his brief, Woods claims that "the exact question at issue[ ] is Woods['s] ability to assist his counsel during trial, specifically during jury selection, due to his inability to remain awake caused by an antipsychotic medication which drugged him into incoherent somnolence." (Pet. Br. at 14.) In short, Woods claims that he was unable to assist his counsel during voir dire on the second day of his trial, because he was unable to stay awake and therefore not competent to stand trial.

Before we address the substance of Woods's competency claim, we must first recount the events leading up to Woods's in-court somnolence. Prior to trial, Woods's trial counsel filed a suggestion of incompetence alleging that Woods was unable to remember particular events of the crime charged. In response, the trial court appointed Drs. Alan LaClave and William Shipley to examine Woods shortly before the scheduled start of trial. Following examinations, both doctors reported Woods competent, and the trial court determined that no competency hearing was required pursuant to Indiana Code § 35-36-3-1. Woods had the opportunity to present to the court his own independent evaluations from experts he had hired, but he declined to do so—apparently because of confidentiality concerns.

In the days leading up to trial, Woods exhibited anxiety and difficulty sleeping. A nurse or other medical official

at the jail in which Woods was being detained prescribed
Elavil, an anti-depressant, psychotropic drug that causes
drowsiness as a side effect. During lunch break on the day
of trial in question, Woods took Elavil. Sure enough,
drowsiness set in, and Woods had great difficulty remaining
awake during the afternoon session of voir dire, despite the
best efforts of his counsel to keep him awake—including,
apparently, pinching and kicking Woods. Eventually, at a
break in the voir dire when the jury pool had left
the courtroom, Woods's trial counsel moved for a continu-
ance because of Woods's condition.

The trial court conducted a short hearing on this motion,
in which Woods himself testified to his difficulty remain-
ing awake due to lack of sleep and the prescribed Elavil.
In addition, Woods's counsel argued that there was a
risk that jurors would interpret Woods's drowsiness as a
lack of interest or concern about the trial.

The trial court granted the motion for a continuance
and, when the jury returned to the courtroom, adjourned
proceedings for the remainder of the day. The judge made
the following statement to the jury by way of explanation:

> Lots of times in matters that come before the court,
> there are things that occur that are not anticipated by
> anybody. It's the fault of none of the lawyers or the
> parties or anything else but when these things occur,
> we have to deal with them. . . . [A] situation . . . has
> arisen through the fault of no one at all but at lunch-
> time, Mr. Woods saw a physician and at that time there
> was a prescription medication approved for him to take.
> He has taken that medication and the result is that he's
> experiencing some problems with drowsiness. Now I
> think as the trial judge in this case, that everyone
> needs to be treated fairly and that in order for him to
> participate and work with his attorneys, he needs to be
> awake and not be dozing off over there and the fact that
> he's dozing off is not his fault; it's not anybody else's
> fault; it's just something that's happened. So, what

> we're going to do is we're going to stop our proceedings for the day and we—arrangements have been made so that this won't be something that we'll have to deal with after today . . . .[I]n the morning . . . we'll take up where we're leaving off and I'm sorry that we have to do this but we just do because we want everything to be handled properly and I think that you can understand that too.

(Tr. at 1492-94.) The trial resumed the following day, and as far as we can tell from the record, Woods suffered no further episodes of sleeping in court for the remainder of his trial.

Despite the events recounted above, Woods contends that he was denied due process because he was incompetent during voir dire (that is, he was unable to assist counsel in his defense because he kept nodding off) and perhaps throughout the remainder of trial and the penalty phase. But we disagree that Woods suffered a constitutional due process violation, and we find no error in the state court's determination that Woods was competent to stand trial.

Woods's due process argument rests on two related and flawed premises. First, as a procedural matter, Woods contends that his drowsiness during voir dire should have triggered a hearing on his competency to stand trial. Second, as a substantive matter, he suggests that he was in fact incompetent to stand trial, and his trial and conviction therefore violated his constitutional rights.

As to Woods's procedural argument, we find no constitutional error in the manner in which the trial court responded to Woods's drowsiness during voir dire. Woods holds fast to the notion that the trial court should have proceeded to a full-blown competency hearing as soon as Woods's drowsiness became apparent. *E.g.*, *Drope*, 420 U.S. at 180-81; *accord Walker v. Attorney Gen. for the State of Oklahoma*, 167 F.3d 1339, 1343 (10th Cir. 1999). But it is

unclear what such a hearing would have accomplished. The purpose of a hearing is to resolve factual disputes. But nobody disputed that Woods was having difficulty remaining awake. As already noted, it was clear to counsel for both sides and the trial court, that Woods kept falling asleep and thus could not assist in voir dire that afternoon. Woods's "incompetence" at the times he dozed is unquestioned, which is precisely the reason that the trial court granted a continuance following a hearing on the causes of Woods's drowsiness. Put another way, the trial court did in fact have a bona fide doubt that Woods could assist his counsel or understand the proceedings while he slept during a portion of voir dire, and the court undertook an appropriate procedure to address the issue.

As for Woods's assertion that he suffered prejudice when jurors witnessed him dozing through portions of voir dire, the trial court specifically addressed this concern when the judge explained why he was adjourning voir dire early and stressed that Woods was not at fault. Like the district court, we conclude that Woods has identified no procedural deficiency in the trial court's response to Woods's somnolence. Moreover, we note that Woods made no objection to the jury that was eventually empaneled, nor did he move to strike any jurors that may have passed muster during voir dire while he dozed.

As for Woods's substantive argument, as discussed above, we agree that Woods was, strictly speaking, "incompetent" at the times he was asleep. It is beyond dispute that a slumbering defendant cannot be said to be capable of doing much of anything, let alone exhibiting the *present* ability to assist in his own defense. But there is a big difference between the sort of temporary incompetence stemming from Woods's Elavil-induced drowsiness during voir dire and the sort that would render Woods incapable of standing trial altogether. As detailed above, Woods's drowsiness, which he concedes was due to Elavil and lack of sleep, did not on its

own indicate incompetence stemming from causes that his pre-trial examinations failed to reveal. To the extent that Woods now suggests that his drowsiness may have been symptomatic of other, undisclosed causes that rendered Woods incompetent to stand trial, he provides no argument in support of this suggestion, nor does the record support such a claim here.

Looking beyond Woods's episode of drowsiness during voir dire, we are confident that the determinations of competency throughout the various stages of this case in the state courts are amply supported by the record and not improper. As mentioned, the trial court determined, on the basis of the evaluations of two court-appointed doctors who reported that Woods was competent to stand trial, that there were no reasonable grounds to justify a competency hearing under Indiana law. Although Woods apparently was maintained on Elavil for the remainder of his trial, the record indicates measures were taken at the jail to administer the drug to Woods only in the evenings at lights-out, not during the day at trial. And even though Woods limits his competency argument to the voir dire, we find no evidence to indicate that Woods slept throughout the remainder of the stages of his trial.

At any rate, our confidence on the issue of Woods's competency at trial is bolstered by the fact that the trial court *did* order a competency hearing, albeit following the penalty phase but prior to sentencing. *Cf. Galowksi v. Berge*, 78 F.3d 1176, 1180-81 (7th Cir. 1996) (noting that retrospective competency hearings, while not ideal, are not inherently improper); *see also Young v. Walls*, 311 F.3d 846, 848 (7th Cir. 2002). At this hearing, Drs. LaClave and Shipley each testified that they had interviewed Woods and concluded that Woods understood the charges against him and the roles of the prosecutor, defense counsel, and the court. The doctors also testified that Woods could sufficiently communicate with his attorneys because he was

able to generate his own ideas as well as understand and evaluate the ideas of others; in short, they reiterated their earlier conclusion that Woods was competent. The hearing also incorporated the trial testimony of professionals who had examined Woods and testified to his chronic lack of self-esteem and depression. After consideration of all of this evidence, coupled with the court's own observations of Woods's demeanor, the court concluded that Woods was competent. The Indiana Supreme Court agreed, concluding that the record provided a clear and reasonable basis for the trial court's decision not to hold a full competency hearing prior to trial and for the post-trial determination of competency. *See Woods I*, 547 N.E.2d at 788.

Woods challenges the pre-trial and post-trial determinations of competency because, he believes, they failed to address the reasons for his "incompetency" during voir dire. That may be so, but for the reasons discussed at length above, it is also irrelevant. The trial court appropriately responded to Woods's Elavil-induced drowsiness by continuing the voir dire and addressing the jury. There is no indication that uncontrollable drowsiness or other suggestion of incompetency reared its head in a similar manner during the remainder of trial. We find no error in the way in which the trial court handled Woods's episode of somnolence, nor does the record offer any reason to conclude that its competency determinations were erroneous or unreasonable given the court's first-hand observation of Woods throughout trial. *Cf. Timberlake*, 409 F.3d at 823-24. In sum, we agree with the district court's conclusion that the state court's determination of competency is a factual determination entitled to deference, *see Foster*, 741 F.2d at 1011, and Woods has not shown any factual error by clear and convincing evidence. *See Conner*, 375 F.3d at 649. In addition, our own review of the record and the arguments advanced by Woods supports the conclusion that Woods was competent to stand trial, and thus there was no due process error on that score.

Before moving on, we address Woods's assertion that he received ineffective assistance of counsel with respect to his drowsiness at voir dire.[2] Woods invokes this argument almost as an afterthought, contending that his trial counsel was constitutionally defective because "it was error to conclude that Woods was afforded a hearing at which his competence on February 20th [the day of voir dire in question] could be determined, and it was error to allow the trial to continue while Woods was so affected by anti-psychotic medication that he slept in open court." (Pet. Reply at 8-9.) Thus, Woods argues, "it is axiomatic that the performance of Woods' counsel at trial in allowing this to happen fell below the prevailing norm of professional services and adversely affected Woods because he was prevented from giving any input into jury selection." (*Id.* at 9.)

Again, we disagree. Our evaluation of Woods's counsel's performance is guided by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, Woods must demonstrate that his counsel's performance was deficient and that the deficient performance prejudiced him. *See id.* at 687. His counsel's performance is deficient if it falls below an "objective standard of reasonableness" under "prevailing professional norms." *Id.* at 688. We view counsel's performance deferentially, with the understanding that there is a great deal of room for disagreement among reasonable attorneys as to the appropriate strategy or tactics to employ in the course of representation, so we indulge the "strong presumption that counsel rendered reasonably effective assistance." *Ashford v. Gilmore*, 167 F.3d 1130, 1134 (7th

---

[2] This aspect of Woods's competency claim was not set forth in the certificate of appealability. Nevertheless, as the Respondent does not object, and in the interest of thoroughness, we undertake review of this claim, as well. *See Dellinger v. Bowen*, 301 F.3d 758, 765 (7th Cir. 2002).

Cir. 1999) (citations omitted). To show that his counsel is constitutionally defective, Woods must show more than that his counsel made poor decisions. Woods must show that his counsel's performance was so substandard that it could not reasonably be said to have functioned as "counsel" in the manner required by the Sixth Amendment. *Eddmonds*, 93 F.3d at 1313 (citing *Strickland*, 466 U.S. at 687). Furthermore, to establish prejudice, Woods must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" and that counsel's unprofessional errors "undermine[d] confidence in the outcome." *Strickland*, 466 U.S. at 694.

Simply put, Woods has not shown that his trial counsel was not up to constitutional par. As previously discussed, there is no indication in the record that Woods continued to display drowsiness after the day in question, so it cannot accurately be contended that Woods's counsel blithely pushed forward with trial even as Woods slumbered. What is more, we cannot see how Woods's counsel acted inappropriately in moving for a continuance when it became apparent that Woods could not remain awake. Although it could be argued, as Woods does, that his trial counsel should have pushed for a full competency hearing in light of his drowsiness, it is far from clear that the trial court would have granted such a request in light of the pre-trial evaluations and determination that Woods was competent (or, for that matter, that the outcome would have been any different if the court had held such a hearing). *Cf. Galowski*, 78 F.3d at 1180; *Eddmonds*, 93 F.3d at 1316-17. In addition, as already discussed, the trial court responded appropriately and took steps to minimize the risk that jurors would hold Woods's drowsiness against him. And, also discussed, Woods presented no support in his state court appeal or here that counsel's alleged failure properly to react to his drowsiness during voir dire infected the jury selection process such that any juror was improperly selected or empaneled.

In short, we conclude that the performance of Woods's counsel was not constitutionally defective with respect to their response to Woods's drowsiness. Even if counsel's performance was substandard, Woods has not shown prejudice from his counsel's failure to argue for a competency hearing in response to his pronounced drowsiness at voir dire. *Cf. Young*, 311 F.3d at 848 (counsel's failure to ask for a competency hearing prior to trial was not prejudicial given the court's finding of competency made at post-trial competency hearing). The Indiana courts' rejection of Woods's competency claims were neither unreasonable nor contrary to clearly established federal law, and the district court properly denied relief on all aspects of Woods's competency claims.

*B. Mitigation*

Woods next argues that his trial counsel was constitutionally infirm for failing to present persuasive mitigating evidence during the penalty phase of his trial under standards established in *Williams v. Taylor*, 529 U.S. 362 (2000), and *Wiggins v. Smith*, 539 U.S. 510 (2003).

Again, we turn to *Strickland* to guide our analysis of Woods's ineffective assistance claims. *See Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997) ("Resolution of a claim of ineffective assistance of counsel at the penalty phase of a capital trial, like other claims of ineffective assistance, involves two elements: performance and prejudice."); *see also Ashford v. Gilmore*, 167 F.3d 1130, 1135 (7th Cir. 1999). In the capital sentencing context, however, the prejudice prong involves a slightly different inquiry: "whether there is a reasonable probability that, absent [counsel's] errors, the [jury] . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001) (quoting *Strickland*, 466 U.S. at 695). As

always, there remains "the strong presumption" that trial counsel rendered adequate representation. *See Bieghler v. McBride*, 389 F.3d 701, 708 (7th Cir. 2004).

Woods argues that the Indiana Supreme Court's resolution of this precise claim was both contrary to and an unreasonable application of Supreme Court precedent, because the state court erroneously applied *Lockhart v. Fretwell*, 506 U.S. 364 (1993), rather than *Strickland v. Washington*, 466 U.S. 668 (1984). For its part, the district court expressed doubt that the Indiana Supreme Court's citation to *Fretwell* was sufficient to establish that the court's disposition of Woods's ineffective assistance claim was in fact "contrary to" Supreme Court authority. *Woods*, 302 F. Supp. 2d at 930 n.2. But the district court nevertheless found that de novo review of Woods's claim yielded the same conclusion—that Woods was unable to show he suffered prejudice as a result of his counsel's performance. *See id.*

We see nothing wrong with the district court's analysis. If anything, the district court acted out of an abundance of caution, for our review of the Indiana Supreme Court's reasoning reveals that the court not only correctly identified *Strickland* as the appropriate legal standard, it also set forth the appropriate *Strickland* prejudice test, applied that test, and concluded that Woods failed to meet it. *Woods II*, 701 N.E.2d at 1224-25 ("[W]e assume, without deciding, that Woods['s] . . . trial counsel's performance fell below prevailing professional norms in one or more respects. Woods nonetheless must show reasonable probability of a different result but for the alleged errors.").

True, the court cited *Fretwell*, but only to the extent that the court concluded that Woods's claim likewise failed to meet *Fretwell*'s "fundamentally unfair or unreliable result" prejudice test. *See Woods II*, 701 N.E.2d at 1225. We do not read the state court's reasoning as resting on

*Fretwell*, nor did the court conclude that *Fretwell* had somehow supplanted *Strickland* as the appropriate standard for ineffective assistance claims, so we will not reverse on that ground. *Cf. Floyd v. Hanks*, 364 F.3d 847, 852-53 (7th Cir. 2004) (concluding that state court properly considered and applied *Strickland* prejudice test, despite reference to "reliability" as used in *Fretwell*); *Winters v. Miller*, 274 F.3d 1161, 1167-68 (2001) (concluding that state court's erroneous application of *Fretwell* did not require reversal of conviction because de novo review under *Strickland* standard rendered the same result). *But see Washington v. Smith*, 219 F.3d 620, 632-33 (7th Cir. 2000) (finding that state court erroneously substituted *Strickland*'s prejudice inquiry with the standard enunciated in *Fretwell*).

At any rate, the Indiana Supreme Court concluded that Woods's mitigation arguments failed because he could not show prejudice:

> With respect to the mitigation evidence, the [PCR] court found that the evidence offered at the postconviction hearing was cumulative of the evidence presented at trial. Woods' contention to the contrary is wholly conclusory; and he concedes that at least some of the evidence was duplicative. In any event, Woods has not explained what any witness would have said, or any investigation would have uncovered, that might have led to a different sentence. He focuses on postconviction testimony illustrating difficulties in his upbringing, particularly related to his abusive mother. These arguments were not only made at trial but credited: on direct appeal we agreed with the trial court's determination that Woods' "turbulent childhood" was a "significant mitigating circumstance." *Woods*, 547 N.E.2d at 782. Thus, even assuming the postconviction evidence on this point was not cumulative, prejudice has not been proved because Woods' surroundings were ac-

cepted as a mitigating factor at sentencing without the postconviction testimony.

*Woods II*, 701 N.E.2d at 1226. We believe that the state court's reasoning is neither contrary to, nor an unreasonable application of *Strickland* for the reasons given. Nevertheless, we hasten to add that—as the district court concluded—our own de novo review leads to the same conclusion.

The gist of Woods's claim is that his trial counsel failed to present mitigation evidence of the quantity or quality that his PCR counsel presented on post-conviction review. Woods claims that the totality of evidence adduced at both the penalty phase and the PCR hearing compares favorably with the available mitigation evidence at issue in *Williams* and *Wiggins* and, as in those cases, calls for a determination that his counsel rendered ineffective assistance at the penalty phase of his trial.

Review of the lengthy trial record in this case reveals that Woods unquestionably came from a tragic background, in large part due to the abuse and neglect of Woods by his mother, Mary Lou Pilkinton. The jury was treated to a substantial body of evidence in this regard. As the Indiana courts noted, the jury heard voluminous testimony during trial—particularly during the penalty phase—that left no doubt that Woods had a truly horrific childhood. Woods's counsel called witnesses who testified in detail about Pilkinton's selfishness, callous disregard of her children, and less-than-admirable lifestyle. The following is but a sampling of what the jury heard.

Pilkinton physically abused Woods and his siblings, and she never showed them any affection. She often left the children to fend for themselves while she went drinking or pursuing men. Worse, Pilkinton had the habit of bringing various men home and even had sex with them in full view of the children. At one point, Pilkinton became the "mama"

of a local motorcycle gang and regularly hosted wild parties at her home, during which much sex and drinking went on in the presence of the children. One evening, Pilkinton "offered" two of her daughters (aged 13 and 11) to some of the bikers. Pilkinton and the various men in her life took sadistic pleasure in physically abusing Woods and his siblings. In addition, the children frequently witnessed Pilkinton herself being mercilessly beaten by these men.

Aside from this abuse, Woods grew up under deplorable home conditions. His father abandoned the family when Woods was several years old. Woods and his siblings had no stable home life either. As Pilkinton became involved with various men, she moved Woods and his siblings around the country, often living in very unhealthy and impoverished conditions, including a dilapidated shack in Arkansas. The children were forced to wear the same clothes (which were dirty and full of holes) for long periods, and often slept in their clothes so that Pilkinton would not have to get them dressed for school.

Jurors also heard testimony from mental health experts who opined that Woods's childhood had a lasting, detrimental effect on him. One expert testified to Woods's depression, anger, and emotional problems, which stemmed largely from his deep-seated feelings of resentment and hatred towards Pilkinton. A psychologist even testified that Woods's childhood was a recipe for sociopathic and impulsive behavior that produced severe personality disorders in Woods. Woods's problems with alcohol and drugs were revealed. Despite these problems, a social worker expressed belief that Woods was capable of showing compassion and could understand and make changes in his life and could be habilitated.

Other witnesses discussed the fact that Woods had been placed in foster care and had great difficulty in adjusting. A social worker testified that Woods often displayed

aggression and violence to other foster children and even to himself (Woods had on one occasion inflicted knife wounds to his own stomach and arms)—circumstances attributable to Woods's unfortunate background and the psychological and emotional effects stemming from it.

Despite the fact that all of these mitigating circumstances—and more—were tendered to the jury to be considered against the aggravating circumstances of Woods's crimes, Woods claims that his counsel failed to present other persuasive mitigation evidence that was revealed for the first time during his PCR hearing. As mentioned, Woods points to substantive mitigating factors present in *Williams* and *Wiggins* that compare favorably with factors in his case and argues that those cases require us to find that his trial counsel were constitutionally infirm during the penalty phase of his trial.

Certainly, the testimony at Woods's PCR hearing undeniably revealed additional, often unpleasant details about Woods's upbringing and the nature of the various abuses he suffered, and some of these additional facts facially resemble some of the horrors recounted in *Williams* and *Wiggins*. For example, Woods points to additional details of his mother's neglect, such as chaining the refrigerator shut and giving food only as a reward for stealing. Other unsavory facts revealed during the PCR hearing provided additional detail regarding Woods's and his siblings' physical and sexual abuse and more fulsome explication of Pilkinton's sexual exploits.

But it is the effectiveness of Woods's trial counsel that we must consider, not merely the presence of factors that superficially resemble those in the aforementioned Supreme Court cases. And that performance in no way approaches the constitutionally defective actions and inactions of the lawyers in *Williams* or *Wiggins*. Woods's trial counsel pursued a reasonable doubt strategy during the guilt phase

of trial and reserved its mitigation arguments for the penalty phase, a strategy that was not inherently unreasonable. The lawyers conducted an investigation, marshaled evidence, and interviewed witnesses. They presented evidence in accordance with their objective of portraying Woods's mother in a very negative light—a not-unreasonable strategy given the wealth of unfavorable evidence detailed above.[3] We cannot agree that counsel's performance was deficient when assessed objectively and measured against "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688.

Unlike in *Wiggins*, counsel in this case actually presented mitigation evidence during the penalty phase rather than a half-hearted attempt to deflect culpability from the defendant. *See Wiggins*, 539 U.S. at 515-18, 526. Furthermore the facts do not indicate a failure to investigate Woods's background thoroughly, nor did counsel simply stop their inquiries after having acquired only "rudimentary knowledge" of Woods's history from a narrow set of sources.

---

[3] While we are on this topic, we note that an argument could be made that Woods's counsel could be faulted for not calling Woods's own mother during the penalty phase to offer additional details in his mitigation. During the PCR hearing, Woods's mother provided an affidavit that provided additional detail of Woods's abuse and neglect at her hands. But, given Woods's trial counsel's strategy of fixing blame on his mother and the outright hostility that apparently existed between them at the time (indeed, Woods's mother was a state witness during the penalty phase), we cannot fault counsel's decision in this regard. *See Timberlake*, 409 F.3d at 824 ("Coerced testimony dragged out of truculent family members is unlikely to persuade a jury that a defendant has redeeming features."). Likewise, counsel's decision not to call a social worker to provide greater detail about Woods's difficulties as a foster child was not unreasonable given counsel's concern that her testimony would open the door to prosecution questioning about Woods's juvenile record. *Cf. id.* at 825.

*See id.* at 524-25. Likewise, Woods's counsel's performance contrasts sharply with that of the lawyers in *Williams*, who failed altogether to investigate and present graphic evidence of Williams's abusive upbringing, and with the performance of other counsel likewise found to have failed meaningfully to present *any* mitigation evidence. *See Rompilla v. Beard*, 125 S. Ct. 2456, 2469 (2005) (finding ineffective assistance where counsel offered only a "few naked pleas for mercy" rather than any of the compelling mitigation evidence that counsel failed to investigate or present).

Really, Woods's claim boils down to the contention that his counsel did not present *enough* mitigating evidence. *See Connor*, 375 F.3d at 666 (noting that such arguments come down to a matter of degrees, which are ill-suited to judicial second-guessing) (citation omitted); *cf. Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir. 1996) ("Presumably, [counsel] is not required to investigate the defendant's past with the thoroughness of a biographer."). But the important point is that the performance of Woods's counsel is easily distinguishable from that in either *Williams* or *Wiggins*, and we can say that counsel's performance did not fall below prevailing professional standards. *Cf. Connor*, 375 F.3d at 662-63.

In the interest of completeness, we also note that even if Woods's counsel's performance was deficient, Woods cannot satisfy the prejudice prong of *Strickland*. Other than simply contending that mitigating factors present in his case compare favorably with factors evident in *Williams* and *Wiggins*, Woods offers nothing to convince us that there is a reasonable probability that the additional details that came up during the PCR hearing would have led the jury to conclude that the balance of aggravating and mitigating factors did not warrant imposition of the death penalty. *Cf. Bieghler*, 389 F.3d at 708. In that regard, we agree with the

Indiana Supreme Court's determination that the additional mitigation evidence was in essence cumulative of the mitigation evidence elicited during the penalty phase. *See Woods II*, 701 N.E.2d at 1226. As such, we find no reasonable probability that the additional evidence would have tipped the scales in Woods's favor. *See Eddmonds*, 93 F.3d at 1322 ("[A] few more tidbits from the past or one more diagnosis of mental illness on[ ] the scale would not have tipped it in [the petitioner's] favor."). Indeed, this possibility is even less likely in light of the nature of the crime for which Woods stood trial and the aggravating circumstances presented to the jury. *Id.* at 1323 ("None of these [undisclosed] facts, individually or collectively, outweighed the countervailing aggravating factors and especially the heinous nature of the crime.").

For all of these reasons, we conclude that the district court properly denied relief as to Woods's mitigation claim.

*C. Conflict of Interest*

Finally, we turn to Woods's contention that he was denied due process when he was granted PCR counsel but not a procedural mechanism for review of his theory that he had a "conflict of interest" with his PCR counsel. Woods characterizes the nature of the conflict thus: "As the case neared the [PCR] hearing date, outright hostility surfaced between Woods and his PCR counsel due to conflicting theories of defense." (Pet. Br. at 6.) Woods filed a pro se motion for substitution of counsel, claiming that his PCR counsel wanted only to present mitigation evidence during the PCR hearing to the exclusion of making guilt-phase arguments. Woods's PCR counsel also filed a motion to withdraw. The PCR court denied both motions.

Although he concedes that he has no constitutional right to collateral review or to PCR counsel, Woods argues that once Indiana has extended these avenues for relief, the

state's mechanisms for providing such relief must comport with the requirements of constitutional due process. *See Evitts v. Lucey*, 469 U.S. 387, 401 (1984). What this means, according to Woods, is that the state should have provided Woods with the opportunity to air his concerns about the "conflict," and the denial of that opportunity was a violation of due process. The state denies that *Evitts* makes his claim cognizable in federal court, but at any rate insists that the district court properly concluded that Woods's claim was barred by procedural default and, in the alternative, that Woods loses on the merits.

In a sense, the dispute over whether Woods has advanced a cognizable due process claim or whether he is procedurally barred from bringing the claim is academic. We agree with the district court's conclusion that even if *Evitts* extends a due process right as Woods frames it, there is no basis for concluding that the state has deprived Woods of that right under the facts present in this case. *Woods*, 302 F. Supp. 2d at 944.

Stripped to its essence, Woods's "conflict" is nothing more than his strenuous disagreement with his counsel. Woods also adds his contention that his "PCR counsel was attempting to coerce Woods into a full confession in front of the PCR court, under the misapprehension that aggravating and mitigating circumstances could be reweighed. Woods had continued to insist, from the time of his arrest over a decade earlier, that he did not remember the circumstances of the crime for which he had been convicted." (Pet. Br. at 6.)

But we agree with the state's argument that, in certain respects, what Woods has characterized as a "conflict" with his counsel is really nothing more than an attempt to advance an ineffective assistance of PCR counsel claim while sidestepping procedural default. Viewed in that light, there was certainly nothing unreasonable about PCR counsel's decision to push forward with a powerful

mitigation strategy at the PCR hearing and to elicit mitigation testimony from Woods himself (who, at trial counsel's suggestion, chose not to take the stand in the penalty phase). Central to the post-conviction litigation strategy was the effort to frame and support the argument that trial counsel was constitutionally defective, and as discussed at length above, a cornerstone of that strategy was to elicit additional details at the PCR hearing that would suggest that trial counsel was not up to snuff during the penalty phase. We have already disposed of that line of argument, but it is equally clear to us that PCR counsel's strategy was a sound one. PCR counsel did, after all, turn up additional mitigation details—albeit details insufficient to indicate that trial counsel was constitutionally ineffective in not eliciting those details the first time around.

As for Woods's suggestion that he had been coerced into giving a confession, the record is bereft of any factual support for this contention (we also note that Woods's tape-recorded confession had been played to the jury at trial). Nor is there any support for Woods's suggestion that his PCR counsel was operating under the misapprehension that the PCR court would reweigh aggravating and mitigating circumstances in deciding whether relief would be granted. Our review of the record supports the conclusion that Woods's PCR counsel pursued a reasonable post-conviction strategy, and any implication that their performance failed to pass constitutional muster must fail.

As far as Woods's suggestion of an "actual conflict of interest," we find at most a disagreement between Woods and his PCR counsel as to strategy. We have found that personality conflicts and disagreements over trial strategy of this sort do not constitute reversible error. *See United States v. Horton*, 845 F.2d 1414, 1418 (7th Cir. 1988); *United States v. Hillsberg*, 812 F.2d 328, 333-34 (7th Cir. 1987). Likewise, to the extent Woods may be suggesting it, we find nothing to indicate that the strategic disagree-

ment hampered his ability to assist PCR counsel at the hearing. *Cf. Matheney v. Anderson*, 377 F.3d 740, 749 (7th Cir. 2004) (concluding that disagreement between lawyers and client as to proper scope of capital trial did not amount to legal incompetency). It follows that there was not an actual conflict of interest in Woods's case such that the Indiana courts were required to put off post-conviction review in order to hear Woods's claims or risk running afoul of the Constitution. Woods's disagreement with his PCR counsel over post-conviction strategy simply does not rise to that level, particularly in light of the eminently reasonable mitigation strategy undertaken by his PCR counsel.

In sum, we conclude that Woods's due process rights were not violated when the state courts declined to grant him an avenue to challenge his "conflict" with his PCR counsel. The district court properly denied relief on this claim.

## II. Conclusion

For the reasons given, we conclude that Woods is not entitled to habeas relief on any of the grounds advanced. The district court's denial of habeas relief is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*