WOOD, Circuit Judge,
dissenting.
No one who has followed the law of federal post-conviction relief for state prisoners since 1996, when the Anti-Terrorism and Effective Death Penalty Act (AEDPA) went into effect, is under the impression that this is a readily available remedy. Indeed, the real question is whether its promise is anything more than an illusion. Success in obtaining relief under 28 U.S.C. § 2254 sometimes seems just as difficult as the rich man’s quest to enter the Kingdom of Heaven, compared in the Bible to a camel’s passing through the eye of a needle. See Matthew 19:23-24. The number of cases in just the last three years in which the Supreme Court has overturned a federal court of appeals for erroneously granting relief under 28 U.S.C. § 2254 is legion; indeed, the Court has often (though not always) chosen to handle these cases on a summary basis, with per curiam opinions. See, e.g., Parker v. Matthews, — U.S.-, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (mem.) (reversing 6th Circuit); Coleman v. Johnson, — U.S. -, 132 *411 S.Ct. 2060, 182 L.Ed.2d 978 (2012) (reversing 3d Circuit); Wetzel v. Lambert, — U.S.-, 132 S.Ct. 1195, 182 L.Ed.2d 35 (2012) (mem.) (reversing 3d Circuit); Hardy v. Cross, — U.S. —, 132 S.Ct. 490, 181 L.Ed.2d 468 (2011) (mem.) (reversing 7th Circuit); Bobby v. Dixon, — U.S. -, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011) (mem.) (reversing 6th Circuit); Cavazos v. Smith, — U.S. -, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (mem.) (reversing 9th Circuit); Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (reversing 9th Circuit); Felkner v. Jackson, — U.S.-, 131 S.Ct. 1305, 179 L.Ed.2d 374 (2011) (mem.) (reversing 9th Circuit); Premo v. Moore, — U.S.-, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011) (reversing 9th Circuit); Harrington v. Richter, — U.S. --, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (reversing 9th Circuit); Berghuis v. Thompkins, — U.S.-, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (reversing 6th Circuit); Renico v. Lett, — U.S.-, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010) (reversing 6th Circuit); and Thaler v. Haynes, — U.S.-, 130 S.Ct. 1171, 175 L.Ed.2d 1003 (2010) (mem.) (reversing 5th Circuit).
But we know that the Court does not mean to suggest that the statute is an empty vessel, because it occasionally rules that a habeas corpus petition may go forward, or at least it permits a decision granting relief to stand. See, e.g., Lafler v. Cooper, — U.S.-, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012) (upholding 6th Circuit’s finding of violation but remanding on remedy); Wood v. Milyard, — U.S.-, 132 S.Ct. 1826, 182 L.Ed.2d 733 (2012) (reversing 10th Circuit decision that petition was untimely); Allen v. Lawhorn, — U.S.-, 131 S.Ct. 562, 178 L.Ed.2d 575 (2010) (mem.) (denying certiorari over three dissents in case where the 11th Circuit granted relief); Wellons v. Hall, 558 U.S. 220, 130 S.Ct. 727, 175 L.Ed.2d 684 (2010) (mem.) (11th Circuit denied relief but Supreme Court reverses); Holland v. Florida, — U.S.-, 130 S.Ct. 2549, 177 L.Ed.2d 130 (2010) (Supreme Court reverses 11th Circuit holding that petition was untimely); Jefferson v. Upton, — U.S. -, 130 S.Ct. 2217, 176 L.Ed.2d 1032 (2010) (mem.) (rejecting 11th Circuit’s denial of relief). Important decisions construing AEDPA and ruling in favor of the petitioner, such as Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007) (competency to be executed), Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (effectiveness of counsel), and Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (effectiveness of counsel), reinforce this point.
In the ease before us, petitioner Michael Overstreet is pursuing a collateral attack under 28 U.S.C. § 2254 against the conviction and the resulting death sentence he received for his brutal murder of Kelly Eckart. In general, he asserts that he received constitutionally ineffective assistance of counsel. He focuses on three particular instances where counsel let him down, the first relating to their handling of an alleged plea bargain, the second relating to the trial court’s handling of the spectators in the courtroom, and the third relating exclusively to the sentencing proceeding. I agree with my colleagues’ disposition of the first two arguments, but I cannot subscribe to their handling of the third. See Opinion, ante at 407-10. In my view, something far more serious and sinister than a simple semantic debate over what Overstreet’s mental illness should be labeled tainted his sentencing hearing. This error has led both the state courts and my colleagues to an unreasonable application of the well known standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *412 This misapprehension will have literally fatal consequences for Overstreet. I therefore respectfully dissent.
I
As my colleagues acknowledge in a profound understatement, “Overstreet has mental problems.” Ante at 407. It was therefore critical at the sentencing stage of his murder trial to place before the jury an accurate picture of the severity of his condition. This information about Over-street’s mental problems was essential to enable the jury to decide what punishment was proper for his offense. Every lawyer involved in the case, from his first attorney (Roy Dickinson), onward had recognized that Overstreet’s mental condition had to be assessed. Dickinson filed a notice of insanity and requested a psychiatric evaluation. Successor counsel Jeffrey Bald win and Peter Nugent sought funds for a mitigation specialist to investigate Overstreet’s life. Such a person was appointed, but his task was thwarted by Overstreet’s inability to recall not only the crimes, but virtually anything about his childhood. Instead, Overstreet perseverated with questions about the reality of the interview and what was happening at that time; he sometimes was unable to recognize the person to whom he was speaking.
Three months before trial, counsel asked for and received funds to engage a mental health expert. They found Dr. Eric En-gum, a neuropsychologist. Dr. Engum diagnosed Overstreet as “a relatively high functioning and well-defended schizophrenic, paranoid type.” Tr. at 803. He recommended an assessment by “a psychiatrist with expertise in psychotic disorders, especially schizophrenia.” Id. at 804. One month before the trial, Overstreet dissolved into a psychotic state while he was in the presence of both his lawyer and Dr. Engum. He was engaging in delusional behavior, disorganized speech, and grossly disorganized behavior. After witnessing this, Dr. Engum changed his primary diagnosis from schizophrenia to a schizotypal personality disorder.
The defense also engaged a second expert, Dr. Robert Smith, who is a clinical psychologist. He diagnosed Overstreet with schizoaffective disorder, which is a combination of schizophrenia and depression; in addition, he identified alcohol dependence as a problem. Dr. Smith later testified that his diagnosis was not even “pretty close” to that of Dr. Engum. PCR at 517. Dr. Engum specifically did not diagnose Overstreet with the disease schizophrenia. Finally, a third expert hired by the defense, psychiatrist Dr. Philip Coons, diagnosed Overstreet with dissociative disorder and schizotypal personality disorder. Dr. Coons was unaware at the time that Smith had also evaluated Over-street. He later said that had he known of the underlying information in Smith’s report as well as information in other sources, he too would have diagnosed Overstreet with the disease schizophrenia.
In order to understand what these competing diagnoses really mean, it is necessary to turn for a moment to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), which is published by the American Psychiatric Association. The DSM is widely recognized as the authoritative source for information about various mental conditions. It uses a multiaxial system for assessments. Id. at 27. The axes are as follows:
Axis I: Clinical Disorders
Other Conditions That May Be a Focus of Clinical Attention
Axis II: Personality Disorders
Mental Retardation
Axis III: General Medical Conditions
*413 Axis IV: Psychosocial and Environmental Problems
Axis V: Global Assessment of Functioning
Id. The critical distinction for our purposes is the one between Axis I, which addresses “clinical” disorders, and Axis II, which addresses “personality” disorders. This is not a mere matter of terminology. Schizophrenic disorders are classified under codes 295.30, 295.10, 295.20, 295.90, and 295.60. Id. at 303. The introduction to this section explains that the disorders (schizophrenia, schizophreniform disorder, schizoaffective disorder, and a few others) “include psychotic symptoms as a prominent aspect of their presentation.” Id. at 297. The term “psychotic” refers to “delusions, any prominent hallucinations, disorganized speech, or disorganized or catatonic behavior.” Id. The manual later notes that “[t]he characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention.” Id. at 299. No single symptom is either necessary or sufficient; instead, the person will display a “constellation of signs and symptoms.” Id.
Personality disorders, in contrast, are described as “an enduring pattern of thinking, feeling, and behaving that is relatively stable over time.” Id. at 688. There is undoubtedly some overlap between the Axis I clinical disorders and the Axis II personality disorders. Nevertheless, when one reads through the discussion of Schizoid Personality Disorder, DSM-IV-TR 301.20, and Schizotypal Personality Disorder, DSM-IV-TR 301.22, it is apparent that these are distinct conditions from the clinical disorder known as Schizophrenia, described in general at DSM-IV-TR page 312, with the various subtypes set forth in the DSM codes mentioned earlier (beginning with DSM-IV-TR 295.30). Notably, the DSM stresses that persons suffering from Schizophrenia or Schizoaffective disorder have more severe and persistent psychotic symptoms than do those with Schizotypal Personality Disorder. See id. at 699-700 (“Schizotypal Personality Disorder can be distinguished from Delusional Disorder, Schizophrenia, and Mood Disorder with Psychotic Features because these disorders are all characterized by a period of persistent psychotic symptoms (e.g., delusions and hallucinations).”)
This brief discussion sheds light on why the experts themselves in Overstreet’s case recognized the critical nature of the distinction between Dr. Engum’s diagnosis of a schizotypal personality (about which the jury heard at sentencing) and Dr. Smith’s diagnosis of a schizoaffective disorder (about which it heard nothing, even though apparently the trial court had a truncated version of a report, without any explanatory testimony). The importance of the distinction becomes even more apparent when we look at the two elements of Overstreet’s argument about ineffective assistance of counsel: deficient performance, and prejudice. See Strickland, supra.
Deficient performance. Overstreet asserts that his counsel’s performance fell below the constitutional minimum when counsel failed to present the full and accurate picture of his mental illness and family history to the sentencing jury. The state court rejected this argument, although it offered no explanation for that conclusion, choosing instead to discuss only prejudice. Even accepting the fact that state courts have no obligation to say anything at all, see Richter, 131 S.Ct. at 784, *414 the court’s conclusion in this case about counsel’s performance is entirely arbitrary.
My colleagues would have us understand Overstreet as saying only that his lawyers were ineffective because they decided to call Dr. Engum rather than Dr. Smith. In fact, that is bad enough, since it left the sentencing jury with the idea that he was merely suffering from an enduring personality disorder, rather than from a serious psychotic illness. The ineffectiveness of that decision would be apparent if Expert A had diagnosed Defendant X with epilepsy, while Expert B opined that X was merely exhibiting histrionic behavior. Epilepsy is a well recognized disease, and the trier of fact could not do its job unless both opinions were properly before it. Our case is no different: Dr. Smith thought Overstreet was suffering from the Axis I clinical psychotic disorder known as schizophrenia, while Dr. Engum thought the problem was far less severe. But the problem is even worse than the lawyers’ failure to call Dr. Smith: they actually entered into a factually inaccurate stipulation that Drs. Smith and Engum had made the same diagnosis. (The majority opinion has nothing to say about this problem.) And this characterization does not depend on our research and interpretation of the DSM. Drs. Smith and Engum agreed that schizophrenia is a more severe diagnosis than schizotypal personality. Dr. Smith testified at the state post-conviction hearings that his diagnosis was not, contrary to the majority’s description here, even “pretty close” to Dr. Engum’s. Dr. Engum also testified — to the jury — that schizophrenia was distinct and characterized by more severe symptoms, and he told them that Overstreet was not “quite there.” The state court seems to have assumed that the jury would not have understood the difference between the two professional opinions, but there is no evidence in the record to support that prediction. Dr. Smith’s later testimony was certainly in plain English, and one must assume that he could have communicated just as well with the jury.
The majority, in my view, has either misunderstood or mischaraeterized Over-street’s argument. They say that Over-street “contends that counsel should have called Smith as well as Engum, the better to impress on the jury his mental problems.” Ante at 408. I cannot find that argument in Overstreet’s brief. Instead, Overstreet emphasizes that counsel failed to understand the distinction between Dr. Engum’s and Dr. Smith’s diagnoses and then compounded the error by making an unreasonable decision to “present the vacillating Engum rather than Smith, who had diagnosed Overstreet with a significantly more severe illness.” Overstreet Br. at 40. Next, although the opinion correctly recognizes the argument that Overstreet should have called Dr. Smith alone, ante at 408, it goes on to state that it would be reasonable for the state court to assume that jurors would not have been affected by “the formal classification” of Overstreet’s disease. It also asserts that “if there was any difference in the way the two described Overstreet’s symptoms, it is hard to discern,” ante at 409. But the reason it is hard to discern is precisely because the lawyers themselves failed to bring out the important differences. Overstreet is not arguing merely about labels, but about what those labels mean: schizophrenia and schizotypal disorder are two distinct diseases, with different symptoms and presentations and different levels of severity. Overstreet’s trial lawyers missed this critical difference, which the DSM-IV-TR spells out at length, and which they should have been aware of given the two different diagnoses made at the time. There is no reason to think that the jury would not have *415 grasped this difference, if anyone had told them about it. Instead, they were told, inaccurately, that all doctors agreed that Overstreet had schizotypal disorder, and they were told that this was less severe than schizophrenia. Dr. Engum told jurors that Overstreet was not psychotic, did not have hallucinations (he minimized them as “perceptual distortions”), and would not have met the test for the insanity defense because of his condition. Dr. Smith’s testimony would have been the opposite in each of these respects.
In the end, I see no choice but to conclude that Overstreet’s lawyers handled the expert testimony at sentencing as they did, not because they were making a strategic decision, but because they were ignorant-they simply did not understand the evidence before them. Ignorance is the antithesis of strategy. We thus have no reason to defer to their actions. My colleagues also criticize Overstreet for failing to present evidence showing that no reasonable lawyer might have preferred Dr. Engum, but I do not read the record that way. At the state post-conviction hearings, Overstreet presented testimony that addressed this very point from two criminal defense experts, Johnson and McDaniels. Johnson testified in the state court that Overstreet’s counsel’s oversight about the distinction between the two doctors’ diagnoses was “the crux of the problem” because the attorneys were working under “the false assumption that your client has an [Axis] two diagnosis [the personality disorder].... And if that’s not true, you’re leading everyone to believe that this individual, the disorder that he suffers from, is not nearly as great as it is.” PCR at 777. Lastly, my colleagues speculate that counsel might rationally have chosen to call Dr. Engum instead of Dr. Smith because it was Dr. Engum who witnessed a psychotic episode by Overstreet, and further that they might have feared that the jury would be confused by conflicting diagnoses. Overstreet’s brief in this court, however, indicates that the post-conviction record contains evidence from counsel to the effect that they had no memory of why they chose to call Dr. Engum and not Dr. Smith. It is not our part to fill in blanks in the record, and so I would give this hypothesis no weight.
Before moving on to the subject of prejudice — which I acknowledge would be enough by itself to defeat Overstreet’s petition, if it cannot be shown — I note that the state court made no mention of a number of additional deficiencies in counsel’s performance. Counsel failed to follow the prevailing professional guidelines in effect at the time of the trial — that is, the 1989 ABA guideline mandating that a defense lawyer should begin a sentencing investigation immediately. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.3 (1989). Overstreet’s lawyers failed to start the process of obtaining psychiatric evaluations until just a few months before trial. In addition, they presented no evidence to explain why Overstreet may not have sought treatment, or may not have complied with the treatment he was given, even though those behaviors are symptoms that go along with his mental illness. This meant that they were utterly unable to respond when the state trial court repeatedly cited Overstreet’s failure to get treatment to lessen the weight that she gave to the mitigating impact of the illness. In fact, counsel did not even bring out the fact that in the months leading up to the crime, Overstreet had been prescribed the drug Paxil, which may perversely have aggravated his symptoms.
The district court thought that Over-street’s case was very much like the one we considered in Woods v. McBride, 430 F.3d 813 (7th Cir.2005), but a closer look *416 at Woods just shows why Overstreet’s case should succeed when that one failed. Woods did “not explain[ ] what any witness would have said, or any investigation would have uncovered, that might have led to a different sentence.” Id. at 823. “Really, Woods’s claim boils down to the contention that his counsel did not present enough mitigating evidence.” Id. at 826 (emphasis in original). Overstreet’s case could not be more different. Overstreet is not complaining generically that his counsel did not present enough mitigating evidence. He is pointing to specific mitigating evidence that was in existence, that his counsel failed to put before the jury, and that would have revealed to the jury that at least one expert — Dr. Smith — believed that Overstreet was suffering from a much more severe mental illness. Nothing in Woods compels, or even supports, the outcome my colleagues have reached here.
Prejudice. The state court gave three reasons for its finding that Overstreet was not prejudiced by counsel’s performance. First, it concluded that it was not clear that a lay-jury would have understood the difference between schizophrenia (or schizoaffective disorder) as opposed to a schizotypal personality disorder. Second, the court noted that even though Dr. Smith did not testify, Dr. Engum opined that Overstreet met the legal definition for mitigation: he was suffering from an extreme mental disturbance and was unable to conform his conduct to the law. Last, the court found that the trial court had considered the written report of Dr. Smith.
I address the last point first. Over-street points out that the trial court did not in fact consider Dr. Smith’s full written report, because that report was not before it. My own examination of the record indicates that this is accurate. Despite the trial court’s statement that it had Dr. Smith’s report, the record contains only a letter from Dr. Smith in which he reports his diagnosis (schizoaffective disorder) but does not explain it further. The sentencing order just restates that diagnosis without mentioning how it differs from that of Dr. Engum. In fact, the following language in the order appears to conflate the two opinions and treat them as equivalents: “Both Dr. Smith and Dr. Engum have diagnosed the Defendant with personality disorders. Dr. Smith has assessed the disorder as ‘schizo affective disorder’ and Dr. Engum as ‘schizotypal personality disorder.’ ” Tr. at 1300; see also Tr. at 5456 (making same mistake in court hearing). This entirely overlooks the important difference reviewed above between psychotic clinical disorders and broader-range personality disorders.
Perhaps this error is what led the state post-conviction court to decide not to reweigh the mitigating evidence that counsel should have presented against the aggravating evidence, to see if there was a reasonable probability that the jury would not have imposed the death sentence if it had known about Dr. Smith’s opinion and its full import. That is the duty that Strickland imposes on a court, see Williams, 529 U.S. at 397-98, 120 S.Ct. 1495, and the state court failed to carry it out. To the extent that the original trial court gave the psychiatric testimony any weight, the court unequivocally erred by downplaying its significance for the reason that Over-street had not sought treatment during the six months leading up to the crime. At one point, the court even implied that the failure to seek treatment was an aggravating factor. This fundamentally misunderstands Overstreet’s disease. Schizophrenic people often fail to seek treatment, as Dr. Coons testified later, “because they don’t really have insight into their illness.” PCR at 460.
*417 The trial court also found no prejudice because Overstreet had taken steps to conceal his crime; these actions, it believed, supported a finding of responsibility. It is true that Overstreet cleaned out his van and revisited the crime scene after the deed was done. But if the court had had Dr. Smith’s full diagnosis before it and had taken it seriously, it would likely have placed different weight on this evidence. Overstreet’s hallucinations and delusions involved compulsions to follow the orders of demons (a classic sign of severe schizophrenia). This compulsion might have affected either his commission of the crime or his efforts to cover it up, or both. As Dr. Coons testified, “The disorder is always present [though] hallucinations are intermittent.” PCR at 525.
Last is the prejudice that counsel inflicted on Overstreet’s case by opting to use Dr. Engum as its star witness. Nothing but lack of preparation can explain this choice. The best evidence of this comes from the state’s closing argument:
The most amazing thing about Dr. Eng-ham [sic] is that if you take him for what he says at his face, he helps the State. I’m surprised after hearing him testify that he actually was called by the Defense.... Dr. Engham testified the Defendant had above average intelligence, he was not insane, he was not schizophrenic, no multiple personalities going on here, he was not psychotic, said he might have had psychotic episodes ... but Dr. Engham said that could have all been faking. He [Over-street] was characterized by Dr. Eng-ham as having a schizotypal personality disorder. When asked what that means in layman’s terms, he said well, 40 or 50 years ago they would have called this guy a hermit. A hermit. He indicated, as we talked about before, not extreme, less than extreme, six to seven on a scale of one to ten.
Tr. at 5322 (emphasis added). The state’s lawyer did not mischaracterize Dr. En-gum’s testimony. Dr. Engum spoke at length about Overstreet’s high IQ, which he found surprising in light of Overstreet’s low levels of academic performance (a fact that he attributed to lack of willpower). Even when he presented the diagnosis of schizotypal personality disorder, he minimized the seriousness of that condition. He left the impression that people with that disorder are merely needy, saying “They’re highly dependent upon others, they strongly need attention and affection, but they don’t get very much because they, themselves, can’t give very much back.” Tr. at 5085.
The overall impression Dr. Engum left was not changed by his brief admission during his testimony that he witnessed Overstreet experiencing a psychotic episode and his concession that people with schizotypal personality disorder can sometimes experience psychotic symptoms. His emphasis throughout was that schizotypal personality disorders fell on the “nonpsychotic side” of disorders. Dr. Smith’s testimony would have given the jury the opposite viewpoint. The majority believes this difference is not so great as to “mark[] the line of moral responsibility.” Ante at 409. But we do not know what level of moral responsibility the jury would have assigned to Overstreet had it been presented with accurate information about the severity of his condition. I do not share the majority’s certainty that it would have made no difference, especially in light of the entirety of Dr. Engum’s testimony, which consistently minimized the severity of Overstreet’s illness, in contrast to Dn Smith’s testimony at the post-conviction hearing. Not just common sense, but also medical research, demonstrates that lay persons react differently to different types of mental illnesses. See, *418 e.g., Melody Sadler et al., Stereotypes of Mental Disorders Differ in Competence and Warmth, 74 Soc. Sci. & Med. 915 (2012) (assessing lay stereotypes of various mental illnesses and concluding that stereotypes and perceptions of those illnesses differed based on the diagnostic label); Bruce Link et al., Public Conceptions of Mental Illness: Labels, Causes, Dangerousness, and Social Distance, 89 Am. J. Pub. Health 1328,1330 (1999) (“The public makes clear distinctions between the disorders in terms of their causes.”). It does not matter that these studies were not conducted specifically with jurors. There is no reason to think that jurors (who after all are lay persons too), would not also react differently to more and less severe mental illnesses. There is a reasonable probability that presenting the jury with Dr. Smith’s testimony that Overstreet had a severe and persistent psychotic disorder would have changed the outcome of the life-and-death decision it had to make.
* * *
The district court, and now my colleagues, have concluded that this record does not show that the decision of the Supreme Court of Indiana was objectively unreasonable, as it must be in order to warrant the grant of Overstreet’s petition under § 2254. With respect, I cannot agree with them. The only three explanations that the state supreme court gave were unreasonable, because they were based on inaccurate factual assumptions. At the heart of the problem lies counsel’s deficient performance in failing to put before the sentencing jury the available evidence showing the seriousness of Over-street’s mental illness. A capital jury cannot make its decision with only half of the story before it, or worse, with objectively inaccurate information. Indeed, the Supreme Court has stressed that the defendant must be able to put all of his mitigating evidence before such a jury. See Wiggins, 539 U.S. at 537, 123 S.Ct. 2527; Williams, 529 U.S. at 396, 120 S.Ct. 1495. Overstreet was prejudiced when that opportunity slipped away because of his counsels’ decisions.
I would grant the petition for a writ of habeas corpus limited to the sentence imposed, and I would give the state an opportunity to conduct resentencing proceedings within a reasonable period of time. I therefore respectfully dissent.