# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-2315

NORMAN TIMBERLAKE,

        *Petitioner-Appellant,*

    *v.*

CECIL DAVIS, **Superintendent,**
**Indiana State Prison,**

        *Respondent-Appellee.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. IP 02-C-36-Y/S—**Richard L. Young**, *Judge*.

_____

ARGUED APRIL 6, 2005—DECIDED MAY 27, 2005
_____

Before EASTERBROOK, RIPPLE, and MANION, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Norman Timberlake and
Tommy McElroy stopped their car and proceeded to urinate
by the side of a highway. A state trooper arrived and learned
that McElroy was a fugitive. While trooper Greene was tak-
ing McElroy into custody, Timberlake shot and killed
Greene. A jury convicted Timberlake of murder and unani-
mously recommended that he be sentenced to death on the
basis of a statutory aggravating factor: the victim was a
police officer acting in the line of duty.

Ind. Code §35-50-2-9(b)(6). The judge imposed the recommended sentence. The Supreme Court of Indiana affirmed, 690 N.E.2d 243 (1997), and rejected a request for collateral relief, 753 N.E.2d 591 (2001). The district court denied Timberlake's petition under 28 U.S.C. §2254 for a writ of habeas corpus.

As the case reaches us, only two questions remain in contention: whether the trial judge should have directed Timberlake to undergo a mental examination to determine his competence for trial, even though neither side asked for an examination; and whether Timberlake's lawyer furnished constitutionally inadequate assistance. With respect to each the state argues, and the district judge held, that Timberlake forfeited the contention by failing to present it to the state judiciary at the required time. We start with this subject, because the two supposed defaults have something in common: the Supreme Court of Indiana relied on state procedural rules that changed after Timberlake's direct appeal.

During the 1980s the Supreme Court of Indiana repeatedly declared that assertions of incompetence to stand trial could be raised on either direct appeal or collateral review. See, e.g., *Smith v. State*, 443 N.E.2d 1187, 1188 (Ind. 1983); *Hammer v. State*, 545 N.E.2d 1, 3 (Ind. 1989). More recently, however, the state's highest court has required defendants to raise on direct appeal all questions that can be resolved on the basis of the trial record. See, e.g., *Rouster v. State*, 705 N.E.2d 999, 1003 (Ind. 1999). (There is an exception for claims of ineffective assistance, which we discuss later.) It applied this approach to Timberlake's complaint about competence, ruling that it had been forfeited because all of the events that Timberlake now says should have alerted the trial judge to the possibility of his mental shortcomings were in the trial record and thus could have been presented in direct appeal. See 753 N.E.2d at 598. Just to be safe,

however, the Supreme Court of Indiana also considered and rejected this contention on the merits. *Id.* at 598-602.

The pattern is much the same for ineffective assistance of counsel. At one time Indiana allowed such contentions to be presented on direct appeal, collateral review, or both, at the defendant's option. Then it began to insist that any claim that could be supported by the trial record be presented on direct appeal—but this caused problems because sometimes the original record has some indicators of deficiencies but not enough to establish a constitutional flaw. Thus like the Supreme Court of the United States, see *Massaro v. United States*, 538 U.S. 500 (2003), the Supreme Court of Indiana eventually held that defendants always may reserve this subject for collateral review. See *Woods v. State*, 701 N.E.2d 1208, 1220 (Ind. 1998); *Ben- Yisrayl v. State*, 738 N.E.2d 253, 259 (Ind. 2000). But it also held that, if the defendant *does* elect to argue ineffective assistance on direct appeal, this is the only shot; a defendant must choose which time to make the argument and cannot do it twice. Again this parallels the federal practice. See *Davis v. United States*, 417 U.S. 333, 342 (1974); *Peoples v. United States*, 403 F.3d 844 (7th Cir. 2005); *United States v. Taglia*, 922 F.2d 413, 418 (7th Cir. 1991). The Supreme Court of Indiana applied these rules to Timberlake's collateral attack and held that he is not entitled to reargue ineffective assistance on the record built on collateral review. 753 N.E.2d at 602-03. Once again taking the cautious route, however, the state court considered the possibility that Timberlake's lawyer on direct appeal had rendered ineffective assistance by contending that trial counsel had furnished ineffective assistance. It held that Timberlake could not show prejudice, because "there is not a reasonable probability that the jury would have found the mitigators [had any been presented] to outweigh the very weighty aggravator." *Id.* at 610.

The dates of these opinions show why both findings of procedural default are problematic. Timberlake's direct

appeal was decided in 1997; important procedural opinions were issued later, and defendants need not anticipate new developments. States are free to apply doctrinal changes retroactively for their own purposes, but only a rule that was established at the time of the act said to constitute the procedural default is an "independent and adequate state ground" that blocks federal collateral review. *Ford v. Georgia*, 498 U.S. 411, 424 (1991); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997). Prescience is not required; a state rule that materially changed after the time of the supposed default cannot be used to show that a federal claim had been forfeited. For federal purposes, then, *Rouster* does not foreclose Timberlake's attempt to raise arguments about his competence to stand trial.

As for ineffective assistance: *Woods* is not the most important decision. *Woods* is Indiana's parallel to *Massaro*, holding that a defendant safely may postpone an ineffective-assistance argument to collateral review. For Timberlake, who elected to present an ineffective assistance claim on direct appeal, the most important development came in *Sawyer v. State*, 679 N.E.2d 1328 (Ind. 1997), which held a defendant who does this cannot raise or elaborate the ineffective-assistance claim on collateral attack, as Timberlake attempted to do. *Sawyer* was issued on May 16, 1997, a little more than six months after the oral argument of Timberlake's direct appeal, but with seven months still to go before the Supreme Court of Indiana issued its decision. That left Timberlake's lawyer ample time to learn about *Sawyer* and withdraw the ineffective-assistance argument in order to preserve the opportunity to make it on collateral attack with a better record.

It is an interesting question whether the appellate brief, the oral argument, or the date of decision on the direct appeal is the time of the act said to constitute the procedural default. We need not decide whether a state may insist that appellate counsel monitor post-briefing or post-argument

decisions, however, because in this court Indiana does not rely on (or even mention) *Sawyer* or its sequel *Bieghler v. State*, 690 N.E.2d 188 (Ind. 1997) (which like *Sawyer* was announced before the resolution of Timberlake's direct appeal). Indiana's procedural-default argument rests entirely on *Woods*, which for reasons that should be clear does not answer the question—though the fact that *Woods* lay in the future may explain *why* Timberlake's appellate counsel did not react to *Sawyer* before the Supreme Court of Indiana issued its initial decision. It is unnecessary to speculate, given the state's decision not to rely on *Sawyer*. We conclude that neither the competence claim nor any aspect of the ineffective-assistance claim has been defaulted; both are open to decision on the merits under §2254.

The argument about competence to stand trial rests on *Drope v. Missouri*, 420 U.S. 162 (1975), and *Pate v. Robinson*, 383 U.S. 375 (1966), which hold that the due process clause requires the trial judge to inquire *sua sponte* into a defendant's mental state, if events in court imply that the accused may be unable to appreciate the nature of the charges or assist his counsel in presenting a defense. Timberlake's current lawyers contend that a series of what they call "erratic and irrational" acts should have put the trial judge on the alert. Here is a recap from Timberlake's brief:

> Before trial, Timberlake repeatedly expressed an irrational distrust for his attorneys, other members of the defense team, and the trial judge. At a pretrial conference he accused the Judge of refusing to approve funds for defense investigators when, in fact, the judge had approved funds. He told the judge he believed defense investigators were being paid for doing investigative work they had not performed. He insisted to the judge that the defense paralegal and law student assisting in the mitigation investigation should be fired because they also

worked for one [of] his former court-appointed attorneys . . . . Timberlake told the judge the first attorney appointed to represent him had "denied [him] every due process right . . . in the book". This paranoid belief was based solely on the attorney's former employment as a police officer.

Comments along these lines do not show either inability to comprehend the proceedings or inability to assist in the defense. They show instead a distrust of the criminal justice system—which from Timberlake's perspective may have been warranted by the considerable number of convictions on his record—plus the usual confusion about just which defense motions had been granted. Comments similar to those Timberlake made are common, sometimes because of suspiciousness and sometimes just because the accused is trying to throw a monkey wrench into the proceedings. Many defendants express dissatisfaction with counsel, assert that their rights have been denied at every turn (because they have an unreasonable view of what rights they possess), demonstrate that they do not understand how the legal system handles witnesses and investigators (that's why they need lawyers, after all), and forget or choose to ignore what judges said earlier. See, e.g., *Matheny v. Anderson*, 377 F.3d 740, 748-49 (7th Cir. 2004); *United States v. James*, 328 F.3d 953 (7th Cir. 2003). Many defendants even dismiss their lawyers because they suppose without justification that more should be done to assist them. See, e.g., *United States v. Hill*, 252 F.3d 919 (7th Cir. 2001). Timberlake's remarks do not imply the kind of mental shortcomings that led to *Pate* and *Drope*.

Defense counsel did not overlook the possibility that Timberlake's remarks showed more than the ordinary disgruntlement of a distrustful accused. They twice arranged for Timberlake to be examined by mental-health specialists. Each time the conclusion was that Timberlake was sane and competent. In the collateral proceedings Timberlake's

new lawyers insisted that this was not enough, because the focus of these exams was his mental state at the time of the crime and during pretrial proceedings; perhaps he had deteriorated by the time of trial. So the judge who conducted the post-trial proceedings had Timberlake examined again and held a hearing at which two psychiatrists testified. The judge found that Timberlake had been competent before, during, and after his trial; the Supreme Court of Indiana concluded "that the postconviction court's ruling on Timberlake's competency is supported by this record . . . . It seems clear that Timberlake was able to understand the nature of the proceedings against him." 753 N.E.2d at 601. Timberlake does not contend that this finding is vulnerable under the criteria used on federal collateral review. See 28 U.S.C. §2254(d)(2), (e)(1). Instead he contends that it reflects only the medical findings after trial. There was no mental-health inquiry right *at* the time of trial, and, as *Drope* emphasizes, a post-conviction inquiry may come too late to be accurate.

What we have here, however, is mental examinations before *and* after trial. For Timberlake to have been incompetent *at* trial, his condition would have had to deteriorate after the first two mental exams, then improve after trial. His counsel in the federal proceedings do not identify any mental disease or defect that would display such a pattern. Persons with mild paranoia have better and worse days, to be sure; many other mental conditions also entail variability. But short-term variability cannot be guarded against even by a mental exam close to trial. Had the state judge sent Timberlake to be examined, there would have been some gap—perhaps two weeks, perhaps six—between the examination and the trial, with a competence hearing and other pretrial proceedings intervening. Then Timberlake doubtless would be making the same argument—that the mental examination did not establish his status while the trial was ongoing. That's an impossible goal, one that neither

*Pate* nor *Drope* (nor any other decision) attributes to the due process clause. We know from examinations both before and after trial that Timberlake was generally competent from 1994 through 2000, and his behavior in court did not imply a dramatic yet temporary deterioration in ability to understand the proceedings and assist his lawyers.

Let us turn, then, to the ineffective-assistance contention. Prejudice is an essential ingredient of this theory, see *Strickland v. Washington*, 466 U.S. 668, 694 (1984), and in an alternative holding the Supreme Court of Indiana found that Timberlake had not established prejudice. 753 N.E.2d at 609-10. That finding does not contradict any authoritative federal rule, so the statutory question becomes whether it is "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". 28 U.S.C. §2254(d)(1). See, e.g., *Brown v. Payton*, 125 S. Ct. 1432 (2005).

Timberlake's principal complaint about his attorneys' performance is that they did not present any mitigating evidence at the penalty phase of the proceeding. Timberlake was himself unavailable: he told the judge that he preferred not to attend and formally waived his right to be present. 690 N.E.2d at 260. This is one of several ways in which Timberlake proved to be his own worst enemy. Without a client to testify (or even to point to in an effort to make him seem less evil), counsel were in difficulty. They chose not to present evidence; instead they "pleaded for mercy, argued against the death penalty, and informed the jury that [Timberlake] would die in jail anyway." *Id.* at 261. The Supreme Court of Indiana concluded on direct appeal that this was neither deficient nor prejudicial:

> Given that defense counsel had an unsympathetic and apparently uncooperative defendant with a criminal history that spans three decades, they may have reasonably concluded that to argue any miti-

gation evidence would be ineffective and would open the door to damaging rebuttal.

*Ibid.* See also *Bell v. Cone*, 535 U.S. 685 (2002), which rejects an ineffective-assistance claim when defense not only omitted mitigating evidence at the penalty phase of a capital prosecution but also did not present any argument on the accused's behalf. On collateral review Timberlake's new legal team attempted to bolster its position by contending that former counsel had neglected to subpoena any witnesses. This omission left them with no evidence and prevented them from making a reasonable strategic choice, new counsel insisted. A lengthy evidentiary hearing explored these issues, and the judge found that counsel had made permissible choices among unattractive options—for the witnesses they might have subpoenaed, all from Timberlake's family, were unwilling to testify voluntarily on his behalf.

Coerced testimony dragged out of truculent family members is unlikely to persuade a jury that a defendant has redeeming features. In the end, as we have mentioned, the Supreme Court of Indiana concluded that the choice counsel made—to present argument about the merit of capital punishment for Timberlake, rather than evidence about his life history—could not have been prejudicial. The record compiled in the collateral proceedings demonstrated that counsel had done a good deal of groundwork for the penalty proceedings. Among other steps, they had engaged a mitigation specialist who compiled a 60-page report. This showed that both of Timberlake's parents were alcoholics who alternated between cruelty and indifference toward him and his siblings. He was poorly educated, fell into crime in adolescence, and spent his rare days of freedom drinking and committing new crimes. He has no redeeming character traits. Timberlake's parents gave him a ghastly upbringing, but presenting this evidence would have been risky— and not just because counsel could not find a family member

who would relate it voluntarily. (Timberlake's relatives apparently do not care whether he lives or dies, and there is a suggestion in the report that some, including his mother, would prefer him dead.) The major problem is that the evidence would depict him as unsocialized and undeterrable, while opening the door to evidence by the prosecution emphasizing his violent tendencies and long criminal history. Although this evidence might persuade a juror that he was so much a victim himself that he should not be blamed, it might also imply that he poses a substantial and irreducible risk of violence to anyone in his vicinity (even in prison) as long as he remains alive. Which way the balance would fall is hard to predict, so sensible lawyers could well decide to omit this evidence and concentrate on finding a juror who thought capital punishment problematic compared with life imprisonment without possibility of parole. In addition to *Bell v. Cone* see, e.g., *Burger v. Kemp*, 483 U.S. 776, 793-94 (1987); *Britz v. Cowan*, 192 F.3d 1101, 1104 (7th Cir. 1999); *Stewart v. Gramley*, 74 F.3d 132, 136-37 (7th Cir. 1996).

Timberlake's theme in this court is: "But they didn't subpoena the family members, so when the penalty phase arrived they had no other option." But why subpoena witnesses you have decided not to use? There is no constitutional obligation to issue pointless legal process. Counsel did not testify that they *wanted* to present Timberlake's mother but forgot to hale her into court. In testimony that appears to have been designed to be as useful as possible to their client, without overstepping legal and ethical bounds, former defense counsel instead testified only that they did not subpoena any witnesses—carefully omitting mention of their reasons, which Timberlake's new lawyers discreetly elected not to inquire into. The Supreme Court of Indiana did not act unreasonably in concluding that the omission was nonprejudicial. The court remarked on the weakness of the potential testimony compared with the strong aggravating

circumstance (an unprovoked and apparently senseless murder of a police officer), and it observed that counsel pursued a line of argument that might do better than reliance on uncooperative family members.

Counsel had a hard choice to make. Whether the choice was right or wrong does not matter; the Constitution does not guarantee against strategic misjudgments. It is enough that the choice was informed and the risk of prejudice from any error small. The Supreme Court of Indiana did not act unreasonably in coming to this conclusion.

Timberlake's other disagreements with his former lawyers' performance have been considered but do not require discussion beyond the observation that the state judiciary's handling of these specifications, too, was not unreasonable.

AFFIRMED

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*