# In the
# Indiana Supreme Court

| | | |
|---|---|---|
| Norman TIMBERLAKE, | ) | Supreme Court Cause No. |
| Petitioner, | ) | 49S00-0606-SD-235 |
| v. | ) | |
| | ) | Marion Superior Court |
| STATE of Indiana, | ) | Case No. 49G02-9302-CF-014191 |
| Respondent. | ) | |

## PUBLISHED ORDER CONCERNING SUCCESSIVE PETITION
## FOR POST-CONVICTION RELIEF IN CAPITAL CASE

### Introduction

Having exhausted the judicial review to which he is entitled as a matter of right, Norman Timberlake remains sentenced to death for murdering a law enforcement officer acting in the line of duty, and the State has requested an execution date be set. Timberlake has filed papers requesting permission to litigate a successive post-conviction claim that his mental illness renders him "incompetent to be executed" under the state and federal constitutions. However, a court-appointed psychiatrist has concluded that, although Timberlake has active and chronic paranoid schizophrenia, Timberlake has the mental capacity to understand that he is about to be executed and why. Because we conclude on the record before us that Timberlake has not shown a reasonable possibility that he is "incompetent to be executed" (and thus entitled to relief on his claim), we deny his request for further review of his sentence. A date for execution of the sentence will be set by separate order.

### Case History

On February 5, 1993, Timberlake and Tommy McElroy were driving south on Interstate 65, heading toward Indianapolis, having spent part of that day and the previous evening drinking alcohol in a bar. McElroy stopped the vehicle along the road to urinate. Master Trooper Michael Greene, an Indiana state police officer, stopped to investigate. A radio check identified McElroy as a person wanted by the police. Trooper Greene told Timberlake he was free to leave, but would not allow Timberlake to drive the vehicle from the scene due to his alcohol consumption. As Greene was handcuffing McElroy, Timberlake shot Greene. Timberlake was soon apprehended, in possession of the gun used to kill Trooper Greene.

Timberlake was tried for murder and carrying a handgun without a license. *See* Ind. Code §§ 35-42-1-1(1) (murder); 35-47-2-1 (handgun offense). The State sought the death penalty, alleging one aggravating circumstance that would render Timberlake eligible for a death sentence: "the victim of the murder was a . . . law enforcement officer [who] . . . was acting in the course of duty." I.C. § 35-50-2-9(b)(6)(A).

The jury found Timberlake guilty as charged and, in the penalty phase that followed, unanimously recommended the death sentence. *See* I.C. § 35-50-2-9(e) (West Supp. 1990) (providing that a jury may recommend the death penalty only if it finds the state has proved an

aggravating circumstance beyond a reasonable doubt and that any mitigating circumstances are outweighed by the aggravating circumstances). The Marion Superior Court sentenced Timberlake to death.

The convictions and sentence were affirmed at each stage of subsequent review. We affirmed the death sentence on direct appeal in Timberlake v. State, 690 N.E.2d 243 (Ind. 1997) (addressing arguments relating to the sufficiency of the evidence, the prosecutor's conduct, the assistance of counsel, the fairness of the trial, and the appropriateness of the death sentence), *reh'g denied* (1998), *cert. denied*, 525 U.S. 1073 (1999). Timberlake sought collateral relief in a state trial court via Indiana's established post-conviction review procedures, but the trial court denied his post-conviction petition and we affirmed in Timberlake v. State, 753 N.E.2d 591 (Ind. 2001) (addressing arguments relating to Timberlake's competency, the effective assistance of counsel, and the fairness of the trial), *reh'g denied*, *cert. denied*, 537 U.S. 839 (2002). Timberlake then sought relief in federal courts. The United States District Court for the Southern District of Indiana denied Timberlake's petition for a writ of habeas corpus in Timberlake v. Davis, No. IP 02-0036-C-Y/S, slip op. (S.D. Ind. Mar. 24, 2004). The United States Court of Appeals for the Seventh Circuit affirmed in Timberlake v. Davis, 409 F.3d 819 (7th Cir. 2005), *reh'g denied*, 418 F.3d 702 (7th Cir. 2005), *cert. denied*, Timberlake v. Buss, 126 S. Ct. 1910 (2006).

Timberlake has thus received the review of the convictions and death sentence to which he is entitled as a matter of right.

**Successive Post-Conviction Procedures**

As indicated, Timberlake has already availed himself of our rule that permits a person convicted of a crime in an Indiana state court one collateral review of a conviction and sentence in a post-conviction proceeding. *See* Ind. Post-Conviction Rule 1. Timberlake wants to litigate another or "successive" post-conviction claim in the trial court where he was convicted.

A state appellate court performs a screening function with respect to successive post-conviction claims; the petitioner needs the appellate court's permission to litigate the merits of such claims. P-C. R. 1 § 12. We have jurisdiction in this case because of the death sentence. *See* Ind. Appellate Rule 4(A)(1)(a). If we authorize Timberlake's proceeding, he would be entitled to counsel at public expense and the case would return to the trial court for further proceedings in accordance with Post-Conviction Rule 1. *See* Baird v. State, 833 N.E.2d 28, 30 (Ind. 2005), *cert. denied,* 126 S. Ct. 312 (2005). Successive post-conviction proceedings are allowed to go forward "if the petitioner establishes a reasonable possibility that the petitioner is entitled to post-conviction relief." P-C.R. 1 § 12(b). In deciding whether a petitioner has made the required showing, we consider the applicable law, the successive post-conviction papers, materials from the prior appeals and post-conviction proceedings including the record, briefs and court decisions, and any other material we deem relevant. *See id.*

As a procedural matter, we have held that "incompetent-to-be-executed" claims, such as Timberlake's, may be raised in successive post-conviction petitions. *See* Baird, 833 N.E.2d at 29-30. A prisoner satisfies the "reasonable possibility" burden by submitting a recent assessment from a mental health expert that the prisoner is insane. *See id.* at 30-32. A recent expert opinion

is not necessarily required, however; observations by lay persons, including a prisoner's attorney, and older assessments by experts may be sufficient.  *See id.*

### Timberlake's Incompetent-To-Be-Executed Claim

Timberlake claims that execution of his death sentence will violate the Eighth and Fourteenth Amendments to the United States Constitution[1] and Article I, Sections 13, 16 and 18 of the Indiana Constitution[2] because he is "severely mentally ill, insane and incompetent to be executed."  (Pet. for Post-Conviction Relief, ¶8.)[3]

Ford v. Wainwright, 477 U.S. 399 (1986), holds that the Eighth Amendment prohibits a state from executing persons who are insane at the time of execution.  *See id.* at 409-10.  In this context, the U.S. Supreme Court has indicated that persons are insane if they are "unaware of the punishment they are about to suffer and why they are to suffer it."  *See, e.g.,* Penry v. Lynaugh, 492 U.S. 302, 333 (1989) (effectively adopting Justice Powell's definition of insane from his concurring opinion in Ford), *abrogated in part on other grounds by* Atkins v. Virginia, 536 U.S. 304 (2002).

We have applied this Ford insanity standard to prisoners' claims that mental illness rendered them incompetent to be executed.  *See* Baird v. State, 833 N.E.2d at 29; *accord* Fleenor v. State, No. 41S00-9910-MS-625 (Ind. Dec. 6, 1999) (unpublished order denying permission to litigate a successive post-conviction claim).  We have rejected claims that mentally ill persons are *per se* exempt from execution under the state and federal constitutions and international law. *See* Matheney v. State, 833 N.E.2d 454, 457 (Ind. 2005); Baird v. State, 831 N.E.2d 109, 114-16 (Ind. 2005), *cert. denied*, 126 S. Ct. 312 (2005).  At this stage of the proceedings, Timberlake is presumed to be sane.  *See* Ford, 477 U.S. at 426 (Powell, J., concurring) (when prisoner was competent to stand trial, "[t]he State . . . may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity to

---

[1] The Eighth Amendment prohibits "cruel and unusual punishment."  The Fourteenth Amendment guarantees equal protection and due process to citizens.

[2]  Section 13 specifies in part that "the accused shall have the right to a public trial, by an impartial jury, in the county in which the offense shall have been committed; to be heard by himself and counsel;  to demand the nature and cause of the accusation against him, and to have a copy thereof;  to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor[.]"  Section 16 assures that "[c]ruel and unusual punishments shall not be inflicted" and that "[a]ll penalties shall be proportioned to the nature of the offense."  Section 18 states that the "penal code shall be founded on the principles of reformation, and not of vindictive justice."

[3] Timberlake has submitted a Petition for Post-Conviction Relief; a Successive Post-Conviction Relief Rule 1 Petition; a Memorandum in Support of Motion for Leave to File Successive Petition for Post-Conviction Relief and Motion for Funds; a Verified Motion for Funds to Conduct Psychological Assessment of Indigent Death Row Inmate Who is Severely Mentally Ill and Whose Execution is Imminent; a Reply to State's Response in Opposition to Motion for Leave to File Successive Petition for Post-Conviction Relief; and Petitioner's Memorandum on Report of Court Appointed Psychiatrist's Report.  In addition, Timberlake submitted for Dr. Parker's review various correspondence between Timberlake and his counsel.  The State has filed State's Consolidated Verified Response in Opposition to Motion for Leave to File a Successive Petition for Post-Conviction Relief and Motion for Funds to Conduct Psychological Assessment, and State's Verified Post-Evaluation Memorandum.  Dr. Parker interviewed Timberlake on October 18, 2006 at the state prison, and submitted to us an Independent Psychiatric Evaluation dated October 30, 2006.  A videotape of the interview was submitted by prison officials. The evaluation and the videotape were provided to the parties.

3

trigger the hearing process" (footnote omitted)); *see also* <u>Coe v. Bell</u>, 209 F.3d 815, 820 (6th Cir. 2000); *accord* <u>Baird</u>, 833 N.E.2d at 29; <u>Fleenor</u>, unpublished order at 1-2.

To the extent Timberlake suggests some standard other than the <u>Ford</u> formulation of "insane" should apply, he does not explain what that standard should be, and we decline to modify the standard. We therefore review Timberlake's claim, as we have similar claims previously filed by others, under the <u>Ford</u> standard: persons are incompetent to be executed if they are insane; persons are insane if they are unaware of the punishment they are about to suffer and why they are to suffer it. Timberlake must show a reasonable possibility that he is insane before we will authorize him to litigate the claim on the merits in a state trial court.

Timberlake's papers assert he suffers from a major psychiatric disorder with psychotic features, the focus of which is a paranoid delusional system resulting in his belief that a secret machine, operated by the government, controls, monitors and tortures people through their brains. (*See, e.g.,* Mem. in Support of Mot. for Leave to File Suc. Pet. for Post-Conviction Relief at 2-7.)

Declaring he could not afford one, Timberlake did not submit a recent expert assessment but he argued that due process required an expert be appointed for him at public expense. Neither Indiana law nor our rules provide for payment of such expenses at this screening stage, and we denied his request. (<u>Timberlake v. State</u>, No. 49S00-0606-SD-235 (Ind. Oct. 11, 2006) (unpublished order).) Nonetheless, at the Court's expense, we appointed a psychiatrist, George F. Parker, M.D., to conduct a psychiatric examination of Timberlake for purposes of rendering an opinion on Timberlake's present mental status. (<u>Timberlake v. State</u>, No. 49S00-0606-SD-235 (Ind. Sept. 18, 2006) (unpublished order for mental examination).) After reviewing records and interviewing Timberlake, Dr. Parker submitted a report in which he opined that Timberlake, while mentally ill, is not insane:

> It is my opinion, with reasonable medical certainty, that the defendant has an active and severe form of a serious mental disease, namely, chronic paranoid schizophrenia. It is my opinion, with reasonable medical certainty, that the defendant, despite his serious mental illness, does have the mental capacity to understand that he is about to be executed and to understand why he is to be executed. I base this opinion on the following reasoning:

> During the clinical interview, it was abundantly clear that Mr. Timberlake was severely mentally ill, and suffers from essentially continuous auditory hallucinations. He has created an elaborate paranoid delusional system to account for the continuous auditory hallucinations, which torment him both day and night, without pause. Mr. Timberlake believes that he is the subject of torture by a computer-driven machine operated by prison officials 24 hours a day, seven days a week, and has been the subject of this machine since his arrest and incarceration for the murder of a state police officer. Mr. Timberlake has consistently refused treatment for his illness, as he is convinced both that he is not mentally ill and that his explanation for the voices is absolutely and undeniably correct. It would be noted that people who have paranoid schizophrenia typically have an organized thought process and may present with appropriate manners and hygiene.

4

Despite this severe and ongoing psychosis, Mr. Timberlake has remained relatively organized regarding his legal status. He has maintained his innocence of the charges against him, despite evidence to the contrary that was introduced during his initial criminal trial, and despite the negative results of thorough legal appeals through both the state and federal court systems. During the clinical interview, he demonstrated an awareness that he had been convicted of the murder of a state police officer and had been sentenced to death as a result of this conviction. Therefore, despite abundant evidence of psychotic systems, including constant auditory hallucinations and a complex and organized paranoid delusional system, it was clear, at the time of the clinical interview, that Mr. Timberlake had the mental capacity to understand that he was about to be executed and why he was to be executed.

(Independent Psychiatric Evaluation at 15-16.)

Timberlake's attorneys provided their own (unsworn) observations about Timberlake's recent behavior. They report that Timberlake's thought processes continue to be dominated by the delusion of the machine, that he believes the machine continues to speak to him through his brain and that he has said he is "being executed so that the existence of the machine will remain secret." (Pet. For Post-Conviction Relief at 3.) But nothing in Dr. Parker's report or our review of his interview with Timberlake suggests a person who is "unaware of the punishment he is about to suffer and why he is to suffer it."

The only other information on the record before us concerning Timberlake's mental status was developed years ago. To the extent that information is even relevant to Timberlake's present mental state, we note that none of the doctors who examined Timberlake in earlier proceedings found him insane at that time. Neither doctor who examined him in 1993 concluded he was incompetent to stand trial or insane. *See* <u>Timberlake</u>, 753 N.E.2d at 598 (post-conviction appeal). The four experts who examined Timberlake in 1999 in connection with his first post-conviction proceeding agreed that, although he suffered from a mental illness, he understood the nature of the proceedings. *See id.* at 598-602. His own expert observed that Timberlake knew the crime for which he was convicted, could explain the general context of the post-conviction hearings, and talked about the need to respect the trial court's authority. (P-C Rec. at 2468-71, 2475-80 (April 16, 1999 and September 27, 1999 reports of Rodney J.S. Deaton, M.D.).) Neither the state trial court nor the state post-conviction court found that Timberlake was incompetent. Reviewing that evidence of Timberlake's mental status, the United States Court of Appeals for the Seventh Circuit remarked, "We know from examinations both before and after trial that Timberlake was generally competent from 1994 through 2000, and his behavior in court did not imply a dramatic yet temporary deterioration in ability to understand the proceedings and assist his lawyers." <u>Timberlake v. Davis</u>, 409 F.3d at 823-24.

In short, Timberlake presents no behavior or aspect of his mental state suggesting he meets the <u>Ford</u> standard for insanity. His papers present largely the same evidence that was considered in the earlier competency proceedings by state and federal courts. Not one judge who has considered Timberlake's case has concluded he was incompetent for trial or insane. Nothing in the information before us now suggests any relevant change in his mental status.

The crucial issue is whether Timberlake now understands that he is to be executed and why. The information before us leads us to conclude that Timberlake has not shown a reasonable possibility of establishing that he can meet the Ford standard for insanity.

**Conclusion**

Because Timberlake has not met his burden of establishing a reasonable possibility that he is entitled to post-conviction relief, we decline to authorize the filing of a successive petition. A date for execution of the death sentence will be set by separate order.

Rehearing should not be sought if Timberlake intends merely to raise the same arguments we have already addressed. If he does petition for rehearing, however, he shall certify in the papers presented to the Clerk for filing that copies have been sent by fax or electronic mail to opposing counsel and to the Division of Supreme Court Administration (fax number 317/232-8372).

The Clerk is directed to send a copy of this order to the Public Defender of Indiana; to the Attorney General of Indiana; to the Public Defender Council; to the Prosecuting Attorneys Council; to Danny Bickell, Staff Attorney, United States Supreme Court, One 1st Street N.E. Washington, DC 20543; to Andrew Kohn, 2730 U.S. Courthouse, 219 S. Dearborn Street, Chicago, Illinois 60604; to Wendy Hamilton, 105 Federal Building, 46 E. Ohio Street, Indianapolis, Indiana 46204; to all counsel of record; and to West Group for publication in the bound volumes of this Court's decisions.

Done at Indianapolis, Indiana, this _____ day of December, 2006.

_____
Randall T. Shepard
Chief Justice of Indiana

Shepard, C.J., and Dickson and Sullivan, JJ., concur.
Boehm, J., dissents with opinion in which Rucker, J., concurs.

**Boehm, J., dissenting**.

The issue before us is whether Norman Timberlake is insane within the meaning of the Eighth Amendment prohibition against execution of an insane person. This requires an assessment of his current mental condition. We are not concerned with his insanity at the time of the offense, which is judged by a different formulation of "insanity." Nor is the issue his ability to understand the proceedings and participate in the defense at the time of his trial.

6

I agree with the majority that it seems clear that Timberlake understands that he is to be executed for the murder of Trooper Greene. He therefore is not insane as that term is explained in Justice Powell's concurring opinion in Ford v. Wainwright, 477 U.S. 399 (1986). As I stated in dissenting in Baird v. State, 833 N.E.2d 28, 34 (Ind. 2005), I am not confident that the Ford standard will ultimately prove to be the test for eligibility to be executed consistent with the Eighth Amendment. I concede that most federal and state courts have taken Justice Powell's standard as the current interpretation of the Eighth Amendment. But the Ford formulation has never been squarely adopted by the U.S. Supreme Court, and subsequent decisions of that Court have cast some doubt on it. We are bound by U.S. Supreme Court precedent, but nothing prohibits a state from acting more cautiously in applying the death penalty if there is genuine doubt as to the long term viability of the dominant understanding of current precedent from that Court.

The Ford formulation of the Eighth Amendment standard of insanity was offered by Justice Powell in his separate concurrence. Three years after Ford, the Supreme Court held that executions of mentally retarded persons and juveniles were permissible under the Eighth Amendment. Stanford v. Kentucky, 492 U.S. 361 (1989) (juveniles); Penry v. Lynaugh, 492 U.S. 302 (1989) (mentally retarded);. In Penry, Justice O'Connor, writing for herself, Chief Justice Rehnquist, and Justices White, Scalia, and Kennedy, quoted Justice Powell's standard, and many state and federal courts have taken this as a definitive endorsement of that language by the Supreme Court. This language is not, however, a square holding that is entitled to complete deference as a definitive ruling of the Supreme Court. Only Justice Powell, who provided the fifth and deciding vote in Ford, embraced that formulation in that case. The reference in Penry is a description of Ford in a case upholding execution of a mentally retarded person, where the standard for insanity was not an issue. I agree that many courts have taken the Penry language as an endorsement of the Powell formulation by a majority of the Supreme Court. I nonetheless note that the Penry description is as susceptible of being read as a minimum standard, without necessarily formulating the precise standard. In any event it is dicta, not a holding, and the Supreme Court has not spoken since.

More importantly, both Penry and Stanford have now been overruled. See Roper v. Simmons, 543 U.S. 551 (2005) (execution of juveniles violates the Eighth Amendment); Atkins v. Virginia, 536 U.S. 304 (2002) (execution of the mentally retarded violates the Eighth Amendment). In the course of reexamining Penry and Stanford, more than a majority of the Supreme Court has described the bases for the Eighth Amendment's prohibition against execution of the mentally retarded as "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins, 536 U.S. at 318.

If a person who is not mentally retarded suffers from the same "diminished capacities" it seems equally offensive to the Eighth Amendment to execute that person. We are told that Timberlake believes that a machine is guiding the actions of his jailers and executioners as well as a number of other persons in public life. The machine speaks to him and on occasion tortures him. Dr. Parker concludes that Timberlake is not malingering in these claims. Because Dr. Parker was asked to, and did, opine only as to whether Timberlake met the Ford standard, we

have no opinion as to whether Timberlake met any other standard of "insanity." Surely, most ordinary citizens would consider a genuine belief in this machine and its workings to render Timberlake, like Arthur Baird before him, at least on the margins of insanity. It seems clear from Dr. Parker's report that Timberlake has ordinary intelligence and the ability to communicate. Whether Timberlake's belief in this machine leaves him with "diminished capacities" to "understand and process information" or to "engage in logical reasoning" or to "control impulses" seems more debatable.

As I stated in Baird, we should be cautious in carrying out the death penalty because of its irreversibility, whatever we think of its morality. In Baird's case, it seemed to me that the circumstances of his crime and trial left some question as to whether the death penalty was appropriate, even though it was clear that he met the statutory requirements for eligibility by reason of killing his wife, his mother, and his father. Timberlake engenders no such doubt. He killed a law enforcement officer in the line of duty. Timberlake is nonetheless entitled to the protections of the Constitution of the United States. There is sufficient doubt as to his mental condition that I would permit him to proceed with an adversary proceeding to resolve his eligibility to be executed consistent with the Eighth Amendment.

Rucker, J., concurs.