In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2276

MICHAEL DEAN OVERSTREET,

*Petitioner-Appellant*,

*v.*

BILL WILSON, Superintendent, Indiana State Prison,

*Respondent-Appellee*.

Appeal from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:08-cv-226 PPS—**Philip P. Simon**, *Chief Judge*.

ARGUED JANUARY 18, 2012—DECIDED JULY 11, 2012

Before EASTERBROOK, *Chief Judge*, and BAUER and WOOD,
*Circuit Judges*.

EASTERBROOK, *Chief Judge*. A jury concluded that Michael
Overstreet kidnapped, raped, and murdered Kelly Eckart.
The jury recommended that he be executed for these
offenses, and the state judge imposed a death sentence.
The Supreme Court of Indiana affirmed Overstreet's
convictions and sentence, 783 N.E.2d 1140 (2003), and
affirmed an order denying his petition for post-conviction

relief, 877 N.E.2d 144 (2007). The only issues in this collateral attack under 28 U.S.C. §2254 concern the penalty. The district court denied Overstreet's petition. 2011 U.S. Dist. LEXIS 22175 (N.D. Ind. Mar. 4, 2011).

Overstreet contends that during the penalty proceedings his lawyers made three errors that individually or collectively amount to ineffective assistance. One supposed error is that counsel did not ask the trial judge to require spectators who wore buttons or ribbons with Eckart's picture to remove the displays of sympathy for the victim. *Carey v. Musladin*, 549 U.S. 70 (2006), shows that defendants did not have any constitutional right to such a removal order at the time of Overstreet's trial and appeal—and no decision since *Carey* has created such an entitlement, let alone held that it would apply retroactively. Indiana law could give defendants greater protection than the Constitution does of its own force, and counsel who failed to ensure that defendants received all of their state-law rights might fail the performance element of the ineffective-assistance standard, see *Strickland v. Washington*, 466 U.S. 668 (1984), but Overstreet does not cite any statute, rule, or decision establishing that Indiana entitles defendants to trial in a courtroom free of symbols implying support for the victim. No juror could have doubted that Eckart had friends and family who mourned her death. That's the message the pictures conveyed, and in the post-conviction proceedings the state trial judge found that Overstreet had not established prejudice.

His second contention is that his lawyers failed to convey "effectively" or "meaningfully" the prosecutor's offer of a plea bargain. Overstreet contends that the prosecutor orally proposed a sentence of life in prison without possibility of parole. *Missouri v. Frye*, 132 S. Ct. 1399, 1408–10 (2012), holds that failure to communicate a plea offer to the defendant is deficient performance. Overstreet's lawyers did relay the offer to him, and he turned it down. He contends, however, that the communication was not effective because he was having a psychotic "break" at the time and could not appreciate the offer's significance. *Frye* does not consider whether counsel furnish ineffective assistance by failing to convey a plea offer "effectively"; we assume without deciding that counsel must do so. Similarly, *Frye* does not discuss the proper treatment of oral offers (the Court stressed that the offer to Frye was a writing that contained all material terms); we assume, again without deciding, that counsel's duty to communicate potential bargains to their clients covers oral offers before they are term-complete.

Overstreet has mental problems. The psychiatric evidence in the record leaves little doubt that on some occasions Overstreet would have lacked the ability to evaluate his legal situation rationally. The evidence is mixed about Overstreet's mental state at the time his lawyers presented the offer for his consideration. See 2011 U.S. Dist. LEXIS 22175 at *21–26. The district judge concluded that Overstreet understood the offer and discussed it intelligently with his sister; Overstreet says that the judge was mistaken, but we need not de-

cide. After conducting a six-day hearing on Overstreet's request for collateral relief, the judge who had conducted Overstreet's trial and imposed the death sentence issued a lengthy opinion denying his petition. The judge stated at page 82 of her decision that any shortcoming by counsel did not cause prejudice because, if Overstreet had attempted to plead guilty before trial, she would have rejected the plea. *Frye* holds that, to show prejudice from counsel's failure to convey a plea offer, "defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented." 132 S. Ct. at 1410. Here we have a finding, by the trial judge herself, that she would not have accepted a guilty plea.

The due process clause permits judges to accept guilty pleas from defendants who do not admit the factual basis of the charge against them, when the judge nonetheless has an adequate basis for finding that the defendant committed the crime. See *North Carolina v. Alford*, 400 U.S. 25 (1970). But the Court added that states are not required to accept such pleas, *id*. at 38 & n.11, and Indiana has chosen to forbid *Alford* pleas. See *Carter v. State*, 739 N.E.2d 126, 128–29 (2000). A defendant who wants to plead guilty in Indiana must admit the factual basis of the plea in open court. Overstreet denies having any memory of the night when Eckart

was killed and said repeatedly—to his lawyers and to the trial judge—that he could not plead guilty when he did not know himself to be guilty. This is why the state judge declared that she would not have accepted a guilty plea had Overstreet attempted to enter one.

He contends that *Carter* allows a judge in Indiana to accept a guilty plea from an amnesiac; according to Overstreet, Indiana blocks *Alford* pleas only when the defendant affirmatively denies culpability. But a writ under §2254 cannot be based on a federal court's belief that the state judiciary misunderstands state law. See, e.g., *Wilson v. Corcoran*, 131 S. Ct. 13 (2010). The state trial judge has told us what she would have done, and why, had Overstreet attempted to plead guilty; given *Frye*'s definition of prejudice, that finding is dispositive.

Oversteet's third line of argument is that his lawyers fell short when presenting mitigating evidence during the sentencing hearing. Given 28 U.S.C. §2254(d), this is an uphill battle. See, e.g., *Cullen v. Pinholster*, 131 S. Ct. 1388, 1401–11 (2011); *Harrington v. Richter*, 131 S. Ct. 770 (2011); *Wood v. Allen*, 130 S. Ct. 841 (2010); *Wong v. Belmontes*, 130 S. Ct. 383 (2009). The Supreme Court of Indiana did not contradict any law established by the Supreme Court; it cited *Strickland* and accurately summarized its holding. And, like the district court, we do not think that the state judiciary acted unreasonably in holding not only that counsel's performance was within the bounds of competence, but also that Overstreet did not show prejudice from any shortcoming.

Counsel retained the services of three mental-health professionals: Eric Engum, a neuropsychologist; Robert

Smith, a clinical psychologist; and Philip Coons, a forensic psychiatrist. Engum testified at the sentencing hearing that Overstreet had a "schizotypal personality disorder", which he told the jury was "among the most severe of the personality disorders." He also testified that Overstreet had a "severely disturbed personality structure". Smith testified in the post-conviction hearing that, had he been called, he would have testified that Overstreet had a "schizoaffective disorder", which Smith defined as a combination of schizophrenia and depression. It is unclear whether Coons, had he testified at the sentencing hearing, would have agreed with Engum, with Smith, or offered a third view.

Overstreet contends that counsel should have called Smith as well as Engum, the better to impress on the jury his mental problems, or should have called Smith alone, because schizotypal personality disorder is just a "personality disorder" on Axis II of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, while schizophrenia is a more serious Axis I "clinical disorder". The Supreme Court of Indiana doubted that jurors would have seen much difference, writing: "it is not at all clear that a lay jury would necessarily appreciate the subtle and nuanced distinction between a schizoaffective disorder and a schizotypal personality disorder." 877 N.E.2d at 156. Overstreet replies that this shows that the Supreme Court of Indiana did not understand the evidence, because Smith would have testified to schizophrenia. If five appellate judges, after full briefing, didn't see the difference between Engum's approach

and Smith's, it is unlikely that a lay jury would have done so. But Overstreet is wrong about the state court's appreciation of the evidence; the court expressly related, *ibid*., that to Smith "schizoaffective disorder is a combination of schizophrenia and depression."

In this court Overstreet's lawyers harp on the theme that an Axis I "clinical disorder" is worse than an Axis II "personality disorder" and assert the difference surely would have affected the jury. But it was not clear to the state judiciary, see 877 N.E.2d at 156, and is not clear to us, that psychiatric terminology affects juries. The point of showing a jury that the defendant has a mental disorder is to reduce blameworthiness, because juries are more likely to think capital punishment appropriate when a defendant is morally responsible. See Michelle E. Barnett, Stanley L. Brodsky & Cali Manning Davis, *When Mitigation Evidence Makes a Difference: Effects of Psychological Mitigating Evidence on Sentencing Decisions in Capital Trials*, 22 Behavioral Sciences & the Law 751 (2004). Overstreet's lawyers put on evidence that he has a serious mental abnormality and contended that he is not blameworthy. Engum and Smith agreed about Overstreet's symptoms; they just attached different labels. Whether his condition is called "schizotypal personality disorder" or schizophrenia plus depression does not change the nature of this mitigating strategy.

Smith testified at the post-conviction hearing that his diagnosis was not close to Engum's; he views the difference between Axis I and Axis II as substantial. Engum,

by contrast, testified that there is very little difference between the diagnoses. (He explained that "if there is a dividing line between … psychosis and nonpsychosis, schizotypal is just on the nonpsychotic side. You're close, but you're not quite there.") The state judiciary was entitled to accept Engum's view and to think that what would have affected jurors was not the formal classification but the symptoms the two reported—and if there was any difference in the way the two described Overstreet's symptoms, it is hard to discern.

Hallucinations, for example, are among the distinctions between Axis I and Axis II disorders—yet the line is not some hallucinations versus none, but their frequency. Engum diagnosed Overstreet not only with a schizotypal personality disorder that includes "perceptual distortions" (in Overstreet's case, "seeing shadows out of the corner of his eyes," Engum testified) but also with occasional psychotic breakdowns such as the one Engum witnessed. Engum testified that stresses probably had caused Overstreet to experience similar episodes in the past. Periodic episodes of psychosis entail hallucinations (and Engum so testified); Smith likewise diagnosed Overstreet with a disorder that involves periodic hallucinations. This is a difference, but not the sort of difference that marks the line of moral responsibility. Engum testified emphatically that he viewed Overstreet's ability to "conform his conduct to the requirements of law" as "significantly impaired".

To get around the state court's finding that jurors probably would not have seen much difference between

Engum's and Smith's assessments, Overstreet needs more than his current lawyers' say-so. His trial lawyers testified at the post-conviction hearing that they put Engum but not Smith on the stand for two reasons: first, Engum saw Overstreet have a psychotic episode and could tell the jury what happened, while Smith had not seen such an episode; second, given the decision to have Engum testify, counsel believed that it would have been imprudent to put Smith on the stand, because then the jurors would have learned that mental-health professionals disagreed about Overstreet's condition and might have discounted the testimony of both men.

Overstreet's current lawyers pooh-pooh these rationales and insist that their view—that testimony about schizo-phrenia beats testimony about schizotypal personality disorder, even from a neuropsychologist who has seen the defendant undergo a psychotic episode—is the only sensible approach. *Strickland* tells us, however, that tactical decisions by trial counsel cannot be declared ineffective just because a different set of lawyers would have handled things differently. Overstreet's trial counsel made an informed choice, quite unlike the situation in *Wiggins v. Smith*, 539 U.S. 510 (2003), where counsel had not done an investigation; Overstreet's lawyers decided how to proceed only after receiving the views of three mental-health professionals.

To undermine trial counsel's choices, and the state judiciary's findings about prejudice, Overstreet needs more than lawyers' talk. He needs evidence showing that no reasonable lawyer would have thought Engum

the better witness, and that jurors would be less likely to recommend death for a defendant who has schizophrenia—and that both of these propositions are so strongly supported that the contrary decision by the state judiciary is unreasonable. But the brief does not point to any such evidence; it relies entirely on current counsel's certitude. If we must choose between the belief of the state judiciary that Engum and Smith would have left pretty much the same impression on the jurors, and the belief of Overstreet's current lawyers that the two would have had a materially different effect, both §2254(d) and §2254(e) tell us that the federal judiciary must prefer the conclusions of the state judiciary. It takes clear and convincing evidence to upset a state court's factual finding, see §2254(e)(1), and lawyers' beliefs, however confident and sincere counsel may be, are not "evidence" at all.

In the state post-conviction hearing, Overstreet's new lawyers did not present evidence from an expert in jury psychology, or a statistician, that capital juries are more favorably disposed toward defendants whose condition is called schizoaffective disorder than when the same condition is called schizotypal personality disorder. Overstreet's briefs do not cite any studies in the medical or psychological literature about how different psychiatric terms affect juries. We asked at oral argument whether counsel knew of such a study; the answer was no. We looked and could not find one. A few studies find that the man in the street has different impressions of different psychiatric conditions. See Melody S. Sadler, Elizabeth L. Meagor & Kimberly E. Kaye, *Stereotypes of Mental Disorders Differ in Competence and Warmth*,

74 Social Science & Medicine 915 (2012); Bruce G. Link, Jo C. Phelan, Michaelene Bresnahan, Ann Stueve & Bernice A. Pescosolido, *Public Conceptions of Mental Illness: Labels, Causes, Dangerousness, and Social Distance*, 89 Am. J. Pub. Health 1328, 1330 (1999). But these studies do not concern the behavior of jurors after being informed by testimony; they take untutored public beliefs as givens rather than evaluating laypersons' responses to evidence. So the contest boils down to the beliefs held by Overstreet's current lawyers, versus the beliefs held by his trial lawyers and Indiana's judiciary. Under *Strickland* and the AEDPA, trial counsel and the state judiciary must prevail.

Overstreet has some other arguments about the evidence presented in mitigation, but they pale beside the one we have addressed and do not require discussion.

AFFIRMED

WOOD, *Circuit Judge*, dissenting. No one who has followed the law of federal post-conviction relief for state prisoners since 1996, when the Anti-Terrorism and Effective Death Penalty Act (AEDPA) went into effect, is under the impression that this is a readily available remedy. Indeed, the real question is whether its promise is anything more than an illusion. Success in obtaining relief under

28 U.S.C. § 2254 sometimes seems just as difficult as the rich man's quest to enter the Kingdom of Heaven, compared in the Bible to a camel's passing through the eye of a needle. See Matthew 19:23-24. The number of cases in just the last three years in which the Supreme Court has overturned a federal court of appeals for erroneously granting relief under 28 U.S.C. § 2254 is legion; indeed, the Court has often (though not always) chosen to handle these cases on a summary basis, with per curiam opinions. See, *e.g., Parker v. Mathews*, 132 S. Ct. 2148 (2012) (mem.) (reversing 6th Circuit); *Coleman v. Johnson*, 132 S. Ct. 2060 (2012) (reversing 3d Circuit); *Wetzel v. Lambert*, 132 S. Ct. 1195 (2012) (mem.) (reversing 3d Circuit); *Hardy v. Cross*, 132 S. Ct. 490 (2011) (mem.) (reversing 7th Circuit); *Bobby v. Dixon*, 132 S. Ct. 26 (2011) (mem.) (reversing 6th Circuit); *Cavazos v. Smith*, 132 S. Ct. 2 (2011) (mem.) (reversing 9th Circuit); *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011) (reversing 9th Circuit); *Felkner v. Jackson*, 131 S. Ct. 1305 (2011) (mem.) (reversing 9th Circuit); *Premo v. Moore*, 131 S. Ct. 733 (2011) (reversing 9th Circuit); *Harrington v. Richter*, 131 S. Ct. 770 (2011) (reversing 9th Circuit); *Berghuis v. Thompkins*, 130 S. Ct. 2250 (2010) (reversing 6th Circuit); *Renico v. Lett*, 130 S. Ct. 1855 (2010) (reversing 6th Circuit); and *Thaler v. Haynes*, 130 S. Ct. 1171 (2010) (mem.) (reversing 5th Circuit).

But we know that the Court does not mean to suggest that the statute is an empty vessel, because it occasionally rules that a habeas corpus petition may go forward, or at least it permits a decision granting relief to stand. See, *e.g., Lafler v. Cooper,* 132 S. Ct. 1376 (2012) (upholding

6th Circuit's finding of violation but remanding on remedy); *Wood v. Milyard,* 132 S. Ct. 1826 (2012) (reversing 10th Circuit decision that petition was untimely); *Allen v. Lawhorn,* 131 S. Ct. 562 (2010) (mem.) (denying *certiorari* over three dissents in case where the 11th Circuit granted relief); *Wellons v. Hall,* 130 S. Ct. 727 (2010) (mem.) (11th Circuit denied relief but Supreme Court reverses); *Holland v. Florida,* 130 S. Ct. 2549 (2010) (Supreme Court reverses 11th Circuit holding that petition was untimely); *Jefferson v. Upton,* 130 S. Ct. 2217 (2010) (mem.) (rejecting 11th Circuit's denial of relief). Important decisions construing AEDPA and ruling in favor of the petitioner, such as *Panetti v. Quarterman,* 551 U.S. 930 (2007) (competency to be executed), *Wiggins v. Smith,* 539 U.S. 510 (2003) (effectiveness of counsel), and *Williams v. Taylor,* 529 U.S. 362 (2000) (effectiveness of counsel), reinforce this point.

In the case before us, petitioner Michael Overstreet is pursuing a collateral attack under 28 U.S.C. § 2254 against the conviction and the resulting death sentence he received for his brutal murder of Kelly Eckart. In general, he asserts that he received constitutionally ineffective assistance of counsel. He focuses on three particular instances where counsel let him down, the first relating to their handling of an alleged plea bargain, the second relating to the trial court's handling of the spectators in the courtroom, and the third relating exclusively to the sentencing proceeding. I agree with my colleagues' disposition of the first two arguments, but I cannot subscribe to their handling of the third. See Opinion, *ante* at 5-11. In my view, something far more serious and sinister than a simple semantic debate over what Overstreet's mental

illness should be labeled tainted his sentencing hearing. This error has led both the state courts and my colleagues to an unreasonable application of the well known standard of *Strickland v. Washington,* 466 U.S. 668 (1984). This misapprehension will have literally fatal consequences for Overstreet. I therefore respectfully dissent.

## I

As my colleagues acknowledge in a profound understatement, "Overstreet has mental problems." *Ante* at 3. It was therefore critical at the sentencing stage of his murder trial to place before the jury an accurate picture of the severity of his condition. This information about Overstreet's mental problems was essential to enable the jury to decide what punishment was proper for his offense. Every lawyer involved in the case, from his first attorney (Roy Dickinson), onward had recognized that Overstreet's mental condition had to be assessed. Dickinson filed a notice of insanity and requested a psychiatric evaluation. Successor counsel Jeffrey Baldwin and Peter Nugent sought funds for a mitigation specialist to investigate Overstreet's life. Such a person was appointed, but his task was thwarted by Overstreet's inability to recall not only the crimes, but virtually anything about his childhood. Instead, Overstreet perseverated with questions about the reality of the interview and what was happening at that time; he sometimes was unable to recognize the person to whom he was speaking.

Three months before trial, counsel asked for and received funds to engage a mental health expert. They found Dr. Eric Engum, a neuropsychologist. Dr. Engum diagnosed Overstreet as "a relatively high functioning and well-defended schizophrenic, paranoid type." Tr. at 803. He recommended an assessment by "a psychiatrist with expertise in psychotic disorders, especially schizophrenia." *Id.* at 804. One month before the trial, Overstreet dissolved into a psychotic state while he was in the presence of both his lawyer and Dr. Engum. He was engaging in delusional behavior, disorganized speech, and grossly disorganized behavior. After witnessing this, Dr. Engum changed his primary diagnosis from schizophrenia to a schizotypal personality disorder.

The defense also engaged a second expert, Dr. Robert Smith, who is a clinical psychologist. He diagnosed Overstreet with schizoaffective disorder, which is a combination of schizophrenia and depression; in addition, he identified alcohol dependence as a problem. Dr. Smith later testified that his diagnosis was not even "pretty close" to that of Dr. Engum. PCR at 517. Dr. Engum specifically did *not* diagnose Overstreet with the disease schizophrenia. Finally, a third expert hired by the defense, psychiatrist Dr. Philip Coons, diagnosed Overstreet with dissociative disorder and schizotypal personality disorder. Dr. Coons was unaware at the time that Smith had also evaluated Overstreet. He later said that had he known of the underlying information in Smith's report as well as information in other sources, he too would have diagnosed Overstreet with the disease schizophrenia.

In order to understand what these competing diagnoses really mean, it is necessary to turn for a moment to the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), which is published by the American Psychiatric Association. The DSM is widely recognized as the authoritative source for information about various mental conditions. It uses a multiaxial system for assessments. *Id.* at 27. The axes are as follows:

Axis I:     Clinical Disorders

            Other Conditions That May Be a Focus of Clinical Attention

Axis II:    Personality Disorders

            Mental Retardation

Axis III:   General Medical Conditions

Axis IV:    Psychosocial and Environmental Problems

Axis V:     Global Assessment of Functioning

*Id.* The critical distinction for our purposes is the one between Axis I, which addresses "clinical" disorders, and Axis II, which addresses "personality" disorders. This is not a mere matter of terminology. Schizophrenic disorders are classified under codes 295.30, 295.10, 295.20, 295.90, and 295.60. *Id.* at 303. The introduction to this section explains that the disorders (schizophrenia, schizophreniform disorder, schizoaffective disorder, and a few others) "include psychotic symptoms as a prominent aspect of their presentation." *Id.* at 297. The term "psychotic" refers to "delusions, any prominent hallucinations, disorganized speech, or disorganized or cata-

tonic behavior." *Id.* The manual later notes that "[t]he characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention." *Id.* at 299. No single symptom is either necessary or sufficient; instead, the person will display a "constellation of signs and symptoms." *Id.*

Personality disorders, in contrast, are described as "an enduring pattern of thinking, feeling, and behaving that is relatively stable over time." *Id.* at 688. There is undoubtedly some overlap between the Axis I clinical disorders and the Axis II personality disorders. Nevertheless, when one reads through the discussion of Schizoid Personality Disorder, DSM-IV-TR 301.20, and Schizotypal Personality Disorder, DSM-IV-TR 301.22, it is apparent that these are distinct conditions from the clinical disorder known as Schizophrenia, described in general at DSM-IV-TR page 312, with the various subtypes set forth in the DSM codes mentioned earlier (beginning with DSM-IV-TR 295.30). Notably, the DSM stresses that persons suffering from Schizophrenia or Schizoaffective disorder have more severe and persistent psychotic symptoms than do those with Schizotypal Personality Disorder. See *id.* at 699-700 ("Schizotypal Personality Disorder can be distinguished from Delusional Disorder, Schizophrenia, and Mood Disorder with Psychotic Features because these disorders are all characterized by a period of persistent psychotic symptoms (*e.g.*, delusions and hallucinations).")

This brief discussion sheds light on why the experts themselves in Overstreet's case recognized the critical nature of the distinction between Dr. Engum's diagnosis of a schizotypal personality (about which the jury heard at sentencing) and Dr. Smith's diagnosis of a schizoaffective disorder (about which it heard nothing, even though apparently the trial court had a truncated version of a report, without any explanatory testimony). The importance of the distinction becomes even more apparent when we look at the two elements of Overstreet's argument about ineffective assistance of counsel: deficient performance, and prejudice. See *Strickland, supra.*

*Deficient performance.* Overstreet asserts that his counsel's performance fell below the constitutional minimum when counsel failed to present the full and accurate picture of his mental illness and family history to the sentencing jury. The state court rejected this argument, although it offered no explanation for that conclusion, choosing instead to discuss only prejudice. Even accepting the fact that state courts have no obligation to say anything at all, see *Richter,* 131 S. Ct. at 784, the court's conclusion in this case about counsel's performance is entirely arbitrary.

My colleagues would have us understand Overstreet as saying only that his lawyers were ineffective because they decided to call Dr. Engum rather than Dr. Smith. In fact, that is bad enough, since it left the sentencing jury with the idea that he was merely suffering from an enduring personality disorder, rather than from a serious psychotic illness. The ineffectiveness of that decision would be apparent if Expert A had diagnosed

Defendant X with epilepsy, while Expert B opined that X was merely exhibiting histrionic behavior. Epilepsy is a well recognized disease, and the trier of fact could not do its job unless both opinions were properly before it. Our case is no different: Dr. Smith thought Overstreet was suffering from the Axis I clinical psychotic disorder known as schizophrenia, while Dr. Engum thought the problem was far less severe. But the problem is even worse than the lawyers' failure to call Dr. Smith: they actually entered into a factually *inaccurate* stipulation that Drs. Smith and Engum had made the same diagnosis. (The majority opinion has nothing to say about this problem.) And this characterization does not depend on our research and interpretation of the DSM. Drs. Smith and Engum *agreed* that schizophrenia is a more severe diagnosis than schizotypal personality. Dr. Smith testified at the state post-conviction hearings that his diagnosis was not, contrary to the majority's description here, even "pretty close" to Dr. Engum's. Dr. Engum also testified—to the jury—that schizophrenia was distinct and characterized by more severe symptoms, and he told them that Overstreet was not "quite there." The state court seems to have assumed that the jury would not have understood the difference between the two professional opinions, but there is no evidence in the record to support that prediction. Dr. Smith's later testimony was certainly in plain English, and one must assume that he could have communicated just as well with the jury.

The majority, in my view, has either misunderstood or mischaracterized Overstreet's argument. They say that Overstreet "contends that counsel should have called Smith as well as Engum, the better to impress on the jury his mental problems." *Ante* at 6. I cannot find that argument in Overstreet's brief. Instead, Overstreet emphasizes that counsel failed to understand the distinction between Dr. Engum's and Dr. Smith's diagnoses and then compounded the error by making an unreasonable decision to "present the vacillating Engum rather than Smith, who had diagnosed Overstreet with a significantly more severe illness." Overstreet Br. at 40. Next, although the opinion correctly recognizes the argument that Overstreet should have called Dr. Smith alone, *ante* at 6, it goes on to state that it would be reasonable for the state court to assume that jurors would not have been affected by "the formal classification" of Overstreet's disease. It also asserts that "if there was any difference in the way the two described Overstreet's symptoms, it is hard to discern," *ante* at 8. But the reason it is hard to discern is precisely because the lawyers themselves failed to bring out the important differences. Overstreet is not arguing merely about labels, but about what those labels mean: schizophrenia and schizotypal disorder are two distinct diseases, with different symptoms and presentations and different levels of severity. Overstreet's trial lawyers missed this critical difference, which the DSM-IV-TR spells out at length, and which they should have been aware of given the two different diagnoses made at the time. There is no reason to think that the jury would not have grasped this difference, if anyone had

told them about it. Instead, they were told, inaccurately, that all doctors agreed that Overstreet had schizotypal disorder, and they were told that this was less severe than schizophrenia. Dr. Engum told jurors that Overstreet was not psychotic, did not have hallucinations (he minimized them as "perceptual distortions"), and would not have met the test for the insanity defense because of his condition. Dr. Smith's testimony would have been the opposite in each of these respects.

In the end, I see no choice but to conclude that Overstreet's lawyers handled the expert testimony at sentencing as they did, not because they were making a strategic decision, but because they were ignorant—they simply did not understand the evidence before them. Ignorance is the antithesis of strategy. We thus have no reason to defer to their actions. My colleagues also criticize Overstreet for failing to present evidence showing that no reasonable lawyer might have preferred Dr. Engum, but I do not read the record that way. At the state post-conviction hearings, Overstreet presented testimony that addressed this very point from two criminal defense experts, Johnson and McDaniels. Johnson testified in the state court that Overstreet's counsel's oversight about the distinction between the two doctors' diagnoses was "the crux of the problem" because the attorneys were working under "the false assumption that your client has an [Axis] two diagnosis [the personality disorder]. . . . And if that's not true, you're leading everyone to believe that this individual, the disorder that he suffers from, is not nearly as great as it is." PCR at 777. Lastly, my colleagues speculate that counsel might

rationally have chosen to call Dr. Engum instead of Dr. Smith because it was Dr. Engum who witnessed a psychotic episode by Overstreet, and further that they might have feared that the jury would be confused by conflicting diagnoses. Overstreet's brief in this court, however, indicates that the post-conviction record contains evidence from counsel to the effect that they had no memory of why they chose to call Dr. Engum and not Dr. Smith. It is not our part to fill in blanks in the record, and so I would give this hypothesis no weight.

Before moving on to the subject of prejudice—which I acknowledge would be enough by itself to defeat Overstreet's petition, if it cannot be shown—I note that the state court made no mention of a number of additional deficiencies in counsel's performance. Counsel failed to follow the prevailing professional guidelines in effect at the time of the trial—that is, the 1989 ABA guideline mandating that a defense lawyer should begin a sentencing investigation immediately. ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.8.3 (1989). Overstreet's lawyers failed to start the process of obtaining psychiatric evaluations until just a few months before trial. In addition, they presented no evidence to explain why Overstreet may not have sought treatment, or may not have complied with the treatment he was given, even though those behaviors are symptoms that go along with his mental illness. This meant that they were utterly unable to respond when the state trial court repeatedly cited Overstreet's failure to get treatment to *lessen* the weight that she gave to the mitigating impact of the illness. In

fact, counsel did not even bring out the fact that in the months leading up to the crime, Overstreet had been prescribed the drug Paxil, which may perversely have aggravated his symptoms.

The district court thought that Overstreet's case was very much like the one we considered in *Woods v. McBride,* 430 F.3d 813 (7th Cir. 2005), but a closer look at *Woods* just shows why Overstreet's case should succeed when that one failed. Woods did "not explain[] what any witness would have said, or any investigation would have uncovered, that might have led to a different sentence." *Id.* at 823. "Really, Woods's claim boils down to the contention that his counsel did not present *enough* mitigating evidence." *Id.* at 826 (emphasis in original). Overstreet's case could not be more different. Overstreet is not complaining generically that his counsel did not present *enough* mitigating evidence. He is pointing to specific mitigating evidence that was in existence, that his counsel failed to put before the jury, and that would have revealed to the jury that at least one expert—Dr. Smith—believed that Overstreet was suffering from a much more severe mental illness. Nothing in *Woods* compels, or even supports, the outcome my colleagues have reached here.

*Prejudice.* The state court gave three reasons for its finding that Overstreet was not prejudiced by counsel's performance. First, it concluded that it was not clear that a lay jury would have understood the difference between schizophrenia (or schizoaffective disorder) as opposed to a schizotypal personality disorder. Second, the court noted that even though Dr. Smith did not testify, Dr. Engum

opined that Overstreet met the legal definition for mitigation: he was suffering from an extreme mental disturbance and was unable to conform his conduct to the law. Last, the court found that the trial *court* had considered the written report of Dr. Smith.

I address the last point first. Overstreet points out that the trial court did not in fact consider Dr. Smith's full written report, because that report was not before it. My own examination of the record indicates that this is accurate. Despite the trial court's statement that it had Dr. Smith's report, the record contains only a letter from Dr. Smith in which he reports his diagnosis (schizoaffective disorder) but does not explain it further. The sentencing order just restates that diagnosis without mentioning how it differs from that of Dr. Engum. In fact, the following language in the order appears to conflate the two opinions and treat them as equivalents: "Both Dr. Smith and Dr. Engum have diagnosed the Defendant with personality disorders. Dr. Smith has assessed the disorder as 'schizo affective disorder' and Dr. Engum as 'schizotypal personality disorder.'" Tr. at 1300; see also Tr. at 5456 (making same mistake in court hearing). This entirely overlooks the important difference reviewed above between psychotic clinical disorders and broader-range personality disorders.

Perhaps this error is what led the state post-conviction court to decide not to reweigh the mitigating evidence that counsel should have presented against the aggravating evidence, to see if there was a reasonable probability that the jury would not have imposed the death sentence

if it had known about Dr. Smith's opinion and its
full import. That is the duty that *Strickland* imposes on
a court, see *Williams*, 529 U.S. at 397-98, and the state
court failed to carry it out. To the extent that the original
trial court gave the psychiatric testimony any weight,
the court unequivocally erred by downplaying its signifi-
cance for the reason that Overstreet had not sought treat-
ment during the six months leading up to the crime. At
one point, the court even implied that the failure to
seek treatment was an aggravating factor. This fundamen-
tally misunderstands Overstreet's disease. Schizophrenic
people often fail to seek treatment, as Dr. Coons
testified later, "because they don't really have insight
into their illness." PCR at 460.

The trial court also found no prejudice because
Overstreet had taken steps to conceal his crime; these
actions, it believed, supported a finding of responsibility.
It is true that Overstreet cleaned out his van and revisited
the crime scene after the deed was done. But if the
court had had Dr. Smith's full diagnosis before it and
had taken it seriously, it would likely have placed different
weight on this evidence. Overstreet's hallucinations
and delusions involved compulsions to follow the
orders of demons (a classic sign of severe schizophrenia).
This compulsion might have affected either his
commission of the crime or his efforts to cover it up,
or both. As Dr. Coons testified, "The disorder is always
present [though] hallucinations are intermittent." PCR at
525.

Last is the prejudice that counsel inflicted on Overstreet's case by opting to use Dr. Engum as its star witness. Nothing but lack of preparation can explain this choice. The best evidence of this comes from the state's closing argument:

> The most amazing thing about Dr. Engham [*sic*] is that if you take him for what he says at his face, *he helps the State.* I'm surprised after hearing him testify that he actually was called by the Defense. . . . *Dr. Engham testified the Defendant had above average intelligence, he was not insane, he was not schizophrenic, no multiple personalities going on here, he was not psychotic, said he might have had psychotic episodes . . . but Dr. Engham said that could have all been faking.* He [Overstreet] was characterized by Dr. Engham as having a schizotypal personality disorder. When asked what that means in layman's terms, he said well, 40 or 50 years ago they would have called this guy a hermit. A hermit. He indicated, as we talked about before, not extreme, less than extreme, six to seven on a scale of one to ten.

Tr. at 5322 (emphasis added). The state's lawyer did not mischaracterize Dr. Engum's testimony. Dr. Engum spoke at length about Overstreet's high IQ, which he found surprising in light of Overstreet's low levels of academic performance (a fact that he attributed to lack of willpower). Even when he presented the diagnosis of schizotypal personality disorder, he minimized the seriousness of that condition. He left the impression that people with that disorder are merely needy, saying "They're highly

dependent upon others, they strongly need attention and affection, but they don't get very much because they, themselves, can't give very much back." Tr. at 5085.

The overall impression Dr. Engum left was not changed by his brief admission during his testimony that he witnessed Overstreet experiencing a psychotic episode and his concession that people with schizotypal personality disorder can sometimes experience psychotic symptoms. His emphasis throughout was that schizotypal personality disorders fell on the "nonpsychotic side" of disorders. Dr. Smith's testimony would have given the jury the opposite viewpoint. The majority believes this difference is not so great as to "mark[] the line of moral responsibility." *Ante* at 8. But we do not know what level of moral responsibility the jury would have assigned to Overstreet had it been presented with accurate information about the severity of his condition. I do not share the majority's certainty that it would have made no difference, especially in light of the entirety of Dr. Engum's testimony, which consistently minimized the severity of Overstreet's illness, in contrast to Dr. Smith's testimony at the post-conviction hearing. Not just common sense, but also medical research, demonstrates that lay persons react differently to different types of mental illnesses. See, *e.g.*, Melody Sadler *et al.*, *Stereotypes of Mental Disorders Differ in Competence and Warmth*, 74 SOC. SCI. & MED. 915 (2012) (assessing lay stereotypes of various mental illnesses and concluding that stereotypes and perceptions of those illnesses differed based on the diagnostic label); Bruce Link *et al.*, *Public Conceptions of Mental Illness: Labels, Causes, Dangerousness, and Social Distance*, 89 AM. J. PUB. HEALTH 1328,

1330 (1999) ("The public makes clear distinctions between the disorders in terms of their causes."). It does not matter that these studies were not conducted specifically with jurors. There is no reason to think that  jurors (who after all are lay persons too), would not also react differently to more and less severe mental illnesses. There is a reasonable probability that presenting the jury with Dr. Smith's testimony that Overstreet had a severe and persistent psychotic disorder would have changed the outcome of the life-and-death decision it had to make.

*     *     *

The district court, and now my colleagues, have concluded that this record does not show that the decision of the Supreme Court of Indiana was objectively unreasonable, as it must be in order to warrant the grant of Overstreet's petition under § 2254. With respect, I cannot agree with them. The only three explanations that the state supreme court gave were unreasonable, because they were based on inaccurate factual assumptions. At the heart of the problem lies counsel's deficient performance in failing to put before the sentencing jury the available evidence showing the seriousness of Overstreet's mental illness. A capital jury cannot make its decision with only half of the story before it, or worse, with objectively inaccurate information. Indeed, the Supreme Court has stressed that the defendant must be able to put *all* of his mitigating evidence before such a jury. See *Wiggins*, 539 U.S. at 537; *Williams*, 529 U.S. at 396. Overstreet was prejudiced when that opportunity slipped away because of his counsels' decisions.

I would grant the petition for a writ of habeas corpus limited to the sentence imposed, and I would give the state an opportunity to conduct resentencing proceedings within a reasonable period of time. I therefore respectfully dissent.